THE HONORABLE RICHARD A. JONES
THE HONORABLE MICHELLE L. PETERSON

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| B.F. and A.A., minors, by and through their guardian Joey Fields, et al.<br><br>Plaintiffs,<br><br>v.<br><br>AMAZON.COM, INC., a Delaware corporation, and A2Z DEVELOPMENT CENTER, INC., a Delaware corporation,<br><br>Defendants. | Case No.: 2:19-cv-910-RAJ-MLP<br><br>**DEFENDANTS' MOTION TO COMPEL ARBITRATION AND TO DISMISS PLAINTIFFS' CLAIMS**<br><br><u>**NOTED ON MOTION CALENDAR:**</u><br>**Friday, October 4, 2019**<br><br>**ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ........................................................................1

FACTUAL BACKGROUND ....................................................................................2

I.      Plaintiffs' Claims Regarding the Alexa Voice Service Offering ................2

II.     The Parents' and Household Members' Acceptance of Amazon's Conditions of Use, Alexa Terms of Use and Arbitration Agreements .........................................................................3

ARGUMENT ...........................................................................................................9

I.      The Parties' Arbitration Agreement and Class Waiver Provisions are Enforceable ......................................................................................10

II.     The Account Holders for the Alexa Devices at Issue Agreed to Arbitrate Disputes With Amazon. ..........................................................11

     A.    Washington Law Governs the COUs and Disputes With Amazon. .......................................................................................11

     B.    The Account Holders Assented to Amazon's Arbitration Agreement. ...................................................................................11

III.    Plaintiffs Cannot Avoid the Arbitration Agreements Their Parents Entered When They Registered the Alexa Devices They Allowed Their Children to Use. ............................................................................14

     A.    Plaintiffs Have Exploited the Benefits of Their Parents' Agreements That Permitted Their Use of the Alexa Devices. ...................16

     B.    Plaintiffs' Claims Are Intertwined with Their Guardians' Agreements With Amazon. ........................................................18

IV.    The Amazon COUs Delegate All Other Questions Concerning Arbitrability to the Arbitrator, and Not the Court. ..................................20

V.     Even Absent the Delegation Agreement, This Dispute Falls Within the Scope of the Amazon Arbitration Agreement and is Not Unconscionable. ...................................................................................22

     A.    The Dispute is Within the Broad Scope of the Arbitration Agreement. ...................................................................................22

     B.    The Agreement is Not Unconscionable. ......................................23

CONCLUSION .......................................................................................................24

AMAZON'S MOT. TO COMPEL ARB.     - i -     FENWICK & WEST LLP
CASE NO.: 2:19-CV-910-RAJ-MLP                         1191 SECOND AVENUE, 10TH FLOOR
                                                       SEATTLE, WASHINGTON 98101

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

3

**CASES**

4

*Am. Express Co. v. Italian Colors Rest.*,
133 S. Ct. 2304 (2013)..................................................................................................10

5

*Arthur Andersen LLP v. Carlisle*,
6   556 U.S. 624 (2009)......................................................................................................15

7

*AT&T Mobility LLC v. Concepcion*,
131 S. Ct. 1740 (2011)............................................................................................10, 23

8

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
9   475 U.S. 643 (1986)......................................................................................................20

10

*Brinkley v. Monterey Fin. Servs., Inc.*,
242 Cal. App. 4th 314 (2015)........................................................................................23

11

*Cartagena Enterprises, Inc. v. J. Walter Thompson Co.*,
12   No. 13 CIV. 4238 SAS, 2013 WL 5664992 (S.D.N.Y. Oct. 16, 2013)........................21

13

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
207 F.3d 1126 (9th Cir. 2000) .................................................................................9, 22

14

*Comer v. Micor, Inc.*,
15   436 F.3d 1098 (9th Cir. 2006) ......................................................................................14

16

*Coneff v. AT&T Corp.*,
673 F.3d 1155 (9th Cir. 2012) ......................................................................................10

17

*Crook v. Wyndham Vacation Ownership, Inc.*,
18   13-cv-03669, 2013 WL 11275036 (N.D. Cal. Nov. 7, 2013).......................................21

19

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985)......................................................................................................10

20

*Doe v. Project Fair Bid Inc.*,
21   No. C11-809 MJP, 2011 WL 3516073 (W.D. Wash. Aug. 11, 2011)..........................12

22

*E. W. Bank v. Bingham*,
992 F. Supp. 2d 1130 (W.D. Wash. 2014)....................................................................15

23

*Ekin v. Amazon Services, LLC*,
24   84 F. Supp. 3d 1172 (W.D. Wash. 2014)................................................................11, 22

25

*Erwin v. Cotter Health Centers*,
161 Wash. 2d 676 (2007)..............................................................................................11

26

*Fagerstrom v. Amazon.com, Inc.*,
27   141 F. Supp. 3d 1051 (S.D. Cal. 2015) ................................................................ *passim*

28

*Ferguson v. Corinthian Colls., Inc.*,
733 F.3d 928 (9th Cir. 2013)........................................................................................10

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

**CASES**

*First Options of Chicago, Inc. v. Kaplan*,
  514 U.S. 938 (1995)...................................................................................................12

*Fteja v. Facebook, Inc.*,
  841 F. Supp. 2d 829 (S.D.N.Y. 2012)........................................................................12

*G.G. v. Valve Corp.*,
  No. C16-1941-JCC, 2019 WL 1354152 (W.D. Wash. Mar. 26, 2019) ......................21

*Gandee v. LDL Freedom Enters., Inc.*,
  176 Wash.2d 598 (2013).............................................................................................24

*Hauenstein v. Softwrap Ltd.*,
  No. C07-0572MJP, 2007 WL 2404624 (W.D. Wash. Aug. 17, 2007).......................12

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
  139 S. Ct. 524 (2019).................................................................................................20

*In re Verisign, Inc., Derivative Litig.*,
  531 F. Supp. 2d 1173 (N.D. Cal. 2007) .....................................................................22

*Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*,
  206 F.3d 411 (4th Cir. 2000) .....................................................................................15

*J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*,
  863 F.2d 315 (4th Cir. 1988) .....................................................................................18

*KPMG LLP v. Cocchi*,
  132 S. Ct. 23 (2011)...................................................................................................10

*Kramer v. Toyota Motor Corp.*,
  705 F.3d 1122 (9th Cir. 2013) ...................................................................................14

*McKee v. Audible, Inc.*,
  No. CV 17-1941-GW(EX), 2017 WL 4685039 (C.D. Cal. July 17, 2017) ...............14

*McNamara v. Royal Bank of Scotland Grp., PLC*,
  No. 11-cv-2137-L (WVG), 2012 WL 5392181 (S.D. Cal. Nov. 5, 2012)..................10

*Meyer v. Uber Techs., Inc.*,
  868 F.3d 66 (2d Cir. 2017).........................................................................................12

*Mortensen v. Bresnan Commc'ns LLC*,
  722 F.3d 1151 (9th Cir. 2013) ..............................................................................10, 23

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983)........................................................................................................20

*Nicosia v. Amazon.com, Inc.*,
  384 F. Supp. 3d 254 (E.D.N.Y. 2019) ...........................................................1, 17, 18, 23

**TABLE OF AUTHORITIES**
(continued)

Page(s)

CASES

*Oracle Am., Inc. v. Myriad Grp. A.G.*,
    724 F.3d 1069 (9th Cir. 2013) ................................................................21

*Payne v. Amazon.com, Inc.*,
    No. 2:17-CV-2313-PMD, 2018 WL 4489275 (D.S.C. July 25, 2018) ........................... *passim*

*Peters v. Amazon Servs. LLC*,
    2 F. Supp. 3d 1165 (W.D. Wash. 2013) ................................................... *passim*

*PRM Energy Sys., Inc. v. Primenergy, LLC*,
    592 F.3d 830 (8th Cir. 2010) ................................................................18

*Rent-A-Ctr., W., Inc. v. Jackson*,
    561 U.S. 63 (2010) ......................................................................21, 23

*Republic of Nicaragua v. Standard Fruit Co.*,
    937 F.2d 469 (9th Cir. 1991) ................................................................20

*Selden v. Airbnb, Inc.*,
    No. 16-CV-00933 (CRC), 2016 WL 6476934 (D.D.C. Nov. 1, 2016) ...................................12

*Starke v. Gilt Groupe, Inc.*,
    No. 13 CIV. 5497 LLS, 2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014) ..................................12

*The Council of Cty. & City Employees, AFSCME, AFL-CIO v. Spokane Cty.*,
    32 Wash. App. 422 (1982) ..................................................................20

*Townsend v. Quadrant Corp.*,
    153 Wash. App. 870 (2009) ................................................................16

*Townsend v. Quadrant Corp.* ("*Townsend II*"),
    173 Wash. 2d 451, 465 (2012) ...................................................1, 15, 16, 17

*Veritas Constr., Inc. v. LBG 38, LLC*,
    No. C16-1811-JCC, 2017 WL 347476 (W.D. Wash. Jan. 24, 2017) ...................................24

*Wiseley*,
    709 F. App'x 862 at 864 ....................................................................14

STATUTES

Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.* ........................................ *passim*

OTHER AUTHORITIES

Restatement (Second) of Conflict of Laws, § 187 .................................................11

### INTRODUCTION AND SUMMARY

The Plaintiffs' parents in this suit, who signed up for and then permitted their children to use Amazon's Alexa service on devices in their homes cannot avoid arbitrating their claims by suing in the names of those children.  Plaintiffs do not claim the Alexa devices malfunctioned; to the contrary they allege Alexa performed as designed, providing responses to their spoken questions and allowing them to use its constellation of applications, known as "skills."  Instead, Plaintiffs claim that in performing these functions they requested, Alexa recorded their voices without their consent.  By suing in their children's names, the Parents hope to avoid Amazon's contractual Conditions of Use ("COU") and the Alexa Terms of Use ("Alexa Terms") to which the Parents assented as a condition of and prerequisite to use of the Alexa service.  These terms include both the Parents' express consent to voice recording and, more important for this motion, their express agreement to arbitrate any disputes about Alexa.  Established principles of equity do not allow the parents or their children to duck out of this agreement to arbitrate.  That express agreement precludes this action from proceeding.

Under well-settled law, Amazon's longstanding arbitration provisions are valid.  They have been regularly enforced against both signatories and nonsignatories alike.  *See e.g., Fagerstrom v. Amazon.com, Inc.*, 141 F. Supp. 3d 1051 (S.D. Cal. 2015), *aff'd sub nom. Wiseley v. Amazon.com, Inc.*, 709 F. App'x 862 (9th Cir. 2017) (granting motion to compel arbitration based on arbitration provision in the COUs); *Payne v. Amazon.com, Inc.*, No. 2:17-CV-2313-PMD, 2018 WL 4489275 (D.S.C. July 25, 2018) (same as to nonsignatory who was given goods purchased from Amazon by signatory); *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 258 (E.D.N.Y. 2019) (same as to nonsignatory user of Amazon account); *Peters v. Amazon Servs. LLC*, 2 F. Supp. 3d 1165 (W.D. Wash. 2013), *aff'd*, 669 F. App'x 487 (9th Cir. 2016)) (same as to arbitration provision of Amazon Business Services Agreement).

The Parents and their children cannot, by clever pleading, evade the agreements to arbitrate all disputes with Amazon.  The law of equitable estoppel precludes parents who agree to arbitrate, and whose minor children used and benefitted from the parents' agreements, from denying that obligation.  *See Townsend v. Quadrant Corp.* ("*Townsend II*")¸173 Wash. 2d 451, 465 (2012)

(holding that, where children received the benefit of the bargain their parents entered "the children are, thus, bound by the arbitration agreement to the same extent as their parents.")  The Parents' failure to raise any claims on their own behalves—even though the voice-recording statutes apply equally to adults and children—reveals that suing in the names of their children alone is purely a strategy to avoid arbitration.  But without agreeing to Amazon's terms, the Parents could never have provided the Alexa service to their children, set up devices in their children's rooms and names, or signed their children up for Kid Skills expressly designed for children's use, as occurred here.  In equity, neither the children, who benefited from the Alexa service and their Parents' relationship with Amazon, nor the Parents, who provided that service to them, can now selectively choose to ignore the arbitration provisions that were a precondition to that service.  Any contrary holding would eviscerate the Parents' agreements with Amazon and undermine the federal policies that favor arbitration under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq*.

Accordingly, Amazon respectfully asks that this Court grant Amazon's motion to compel arbitration as to all of Plaintiffs' claims in this action, that it order all claims in this action to binding arbitration on an individual basis, and that it dismiss or stay this action in its entirety.

## **FACTUAL BACKGROUND**

### I.   **Plaintiffs' Claims Regarding the Alexa Voice Service Offering**

Amazon operates the Alexa Voice Service, which lets users who agree to the applicable terms access various Amazon services by speaking instead of typing.  Declaration of Evan Young ¶¶ 2-3.  With a single wake word (typically "Alexa"), users can dictate commands to an Alexa-enabled device to control functions throughout their homes, listen to music, play games, set calendar reminders, shop online, and more.  *Id*.  Amazon offers Alexa services through several means, including smart speakers such as the Amazon Echo and Amazon Echo Dot, mobile iOS and Android applications, and some third-party services. *Id.*

Plaintiffs are twenty-three minors, suing through their 12 respective parents as legal guardians (the "Parents").  All allege their home "contained" or "has contained" between one and a dozen Amazon Echos, Echo Dots, or other Alexa devices beginning at some time from 2015 to 2019.  FAC ¶¶ 43, 49, 55, 61, 67, 73, 79, 85, 91, 97, 103.  Plaintiffs acknowledge that Alexa's

recording function is integral to its ability to respond to directions—that "Alexa Devices are designed to record and respond to communications immediately after an individual says the wake word (typically 'Alexa' or 'Echo')." FAC ¶ 27. Plaintiffs' legal theory is that when recordings are made as needed to transmit requests over the internet and respond to them, Amazon violates the laws of eight states governing unauthorized recording of confidential communications. FAC ¶¶ 129-32. The FAC also includes lengthy, and legally gratuitous,[1] allegations about what Amazon does with those recordings. Notwithstanding the Parents' agreement to Amazon's COUs and Alexa Terms authorizing recording as an element of the Alexa service, the Complaint alleges that "Alexa routinely records and voiceprints millions of children without their consent or the consent of their parents" in violation of these state laws. FAC ¶¶ 38-41.

These Parents do not claim that their or their children's use of Alexa was accidental. The Complaint alleges that most of the minor Plaintiffs "regularly" use Alexa for a variety of services including games, trivia, homework help, or music. *See* FAC ¶¶ 45, 57, 63, 69, 99, 105, 111; *see also id.* ¶¶ 75, 81, 87, 93 (alleging certain plaintiffs used Alexa devices "on several occasions"). Some Parents named particular devices for the kids who used them. Declaration of Trent Gillespie ¶¶ 19, 54, 63, Ex. A. Multiple Parents also signed up for "Kid Skills," which are applications directed to children under age 13 requiring Parents' express consent to recording the child in that context. Young Decl. ¶ 14, Ex. C; Gillespie Decl. ¶¶ 30, 51, 76, 89, Ex. A.

**II.    The Parents' and Household Members' Acceptance of Amazon's Conditions of Use, Alexa Terms of Use and Arbitration Agreements**

The Amazon COUs have, at all times since 2011, included an arbitration agreement with a class action waiver provision. Declaration of Brian Buckley ¶ 4. The provision in effect in 2014, when Alexa first launched, provided, in relevant part that: "Any dispute or claim relating in any way to your use of any Amazon Service, or to any products or services sold or distributed by

---

[1] The statutes the FAC invokes concern the creation, not the retention, of recordings. At the appropriate time, Amazon will rebut Plaintiffs' various other allegations and demonstrate that, after agreeing to the recording of voices necessary to operate the Alexa service, the Parents permitted their children to use the devices. But the first order of business is to determine whether these are issues required to proceed in arbitration, rather than this Court.

1  Amazon or through Amazon.com will be resolved by binding arbitration, rather than in court."

2  *Id.*, Ex. 1 at "Disputes".  Each Parent agreed to similar arbitration provisions, by various means.

3       To activate Alexa, a user must have an Amazon account and link the Alexa device to that

4  account in a registration process.  Young Decl. ¶ 4.  For instance, to register an Alexa mobile app

5  on iOS or Android devices, users must sign in to their Amazon account by clicking a "Sign-In"

6  button.  That button sits immediately above a hyperlinked disclosure that reads "By continuing,

7  you agree to Amazon's Conditions of Use and Privacy Notice," with links to the COUs highlighted

8  in a separate color, as seen below.  *Id.* at ¶¶ 5-6.  Similarly, as shown in the next image, when a

9  user activates an Echo or Echo Dot device, she is also presented a hyperlinked disclosure in a

10 different color that reads "By proceeding, you agree to Amazon's Conditions of Use and all the

11 terms found here."  *Id.* at ¶¶ 10, 12, Ex. A.

12
                    **App Log-in**                    **New Device Activation**

13
14
15
16                          
17
18
19
20
21
22
23
24
25

26 The user must agree to the COU to activate Alexa and cannot proceed to use Alexa without going

27 through the process of agreeing to the COU.  *Id.* at ¶¶ 5-8.  In addition, the first time that users

28 sign in to the Alexa desktop site (alexa.amazon.com) or the Alexa mobile app iOS or Android

devices, they are presented with a welcome screen, which also requires them to agree to the Amazon COUs:

**Alexa Mobile App Welcome**                **Alexa Desktop Website Welcome**




In addition to agreeing to the Amazon COUs during set up of an Echo device, and when continuing past the welcome screen, the user agrees to the Alexa Terms.  Young Decl. ¶¶ 7-8, 10-11.  Like the COUs, the Alexa Terms are hyperlinked from the Alexa mobile app or desktop website screen that a user must use when setting up an Echo device or signing into the Alexa app or desktop website for the first time.  *Id.*  Those Alexa Terms provide that "Any dispute or claim arising from or relating to this Agreement or Alexa is subject to the binding arbitration, governing law, disclaimer of warranties, limitation of liability, and all other terms in the <u>Amazon.com Conditions of Use</u>.  By using Alexa, you agree to be bound by those terms."  Buckley Decl. ¶ 11, Ex. 7.  The Alexa Terms provide a hyperlink to the COUs and its arbitration agreement.  *Id.*

In addition, when a user signs up for the first time to a "Kid Skill"—a third party Alexa voice application that is directed to children under 13—Amazon notifies the Parent of the information collected from the child user of the skill—including their "voice"—and then obtains the Parent's express consent to do so through an additional consent process.  The Parent must

among other things verify his or her identity and then expressly "consent to Amazon's collection, use, and disclosure of Child Personal Information," by clicking an "I agree" button as shown below.  Alternately, the Parent can decline by clicking "No thanks."  Young Decl. ¶ 14, Ex. C.



Finally, Amazon users also agree to the Amazon COUs containing the arbitration agreement each and every time they make a purchase through Amazon's standard checkout flows. Buckley Decl. ¶¶ 3, 24-26.

Each of Plaintiffs' Parents agreed to the Amazon COUs and the arbitration provision when they created their Amazon accounts and when they registered the Alexa-enabled devices that Plaintiffs used.  In addition to agreeing to the COU and Alexa Terms when first activating an Alexa device, the Parents also agreed to the Amazon COUs multiple times, in some cases, hundreds of times, when making purchases through Amazon.  The Parents' account histories and agreements to the Amazon COUs and Alexa terms are summarized below and described in greater detail in the Declaration of Trent Gillespie.

**Alison O'Neil, C.O.'s guardian**.  Ms. O'Neil was required to accept the Amazon COUs and Alexa Terms at least when she registered an Echo Dot device and Alexa mobile app for iOS on July 25, 2018.  *See* Gillespie Decl. ¶¶ 8-12, Ex. A.   She also registered Alexa mobile apps on iOS devices on January 25, 2019; and August 2, 2019.  *Id.*   In addition, she accepted the Amazon COUs as many as 31 times when she placed purchase orders on Amazon.  Declaration of Owen Bell, ¶ 3, Ex. A.

**Melissa Lock, C.L.'s guardian**.  Ms. Lock was required to accept the Amazon COUs and

Alexa Terms at least when she registered an Echo Dot to her account on December 28, 2017.  *See* Gillespie Decl. ¶¶ 15-16, Ex. A.  In addition, she accepted the Amazon COUs as many as 385 times when she placed purchase orders on Amazon.  Bell Decl. ¶ 3, Ex. A.

**Mistie Burris, W.B.'s, A.L.'s, K.S.'s, and A.S.'s guardian**.  The Amazon account used by Ms. Burris is registered in the name of her husband, and it has seven Android devices and four Echo Dots.  *See* Gillespie Decl. ¶¶ 19-29, Ex. A.  The Burrises were required to agree to the Amazon COUs and Alexa Terms at least when they activated Echo Dots on November 24, 2017; July 23, 2018; and July 24, 2018.  *Id.*  They also registered Alexa mobile apps on Android devices on December 25, 2017; December 26, 2017; January 6, 2018; July 23, 2018; December 25, 2018; January 2, 2019; and August 23, 2019.  *Id.*  Several devices have names reflecting that they are in Ms. Burris' children's rooms.  *Id.*  The Burrises also separately set up a variety of Kid Skills on their Alexa devices.  In doing so, the Burrises again expressly authorized Amazon to collect Plaintiffs' voices.  *Id.* at ¶ 30.  In addition, the Burrises' accepted the Amazon COUs as many as 1311 times when they made purchases on Amazon.  Bell Decl. ¶ 3, Ex. A.

**Angela Brine, R.B.'s guardian**.  Ms. Brine was required to accept the Amazon COUs and Alexa Terms at least when she registered an Echo Dot to her account on August 26, 2017.  *See* Gillespie Decl. ¶¶ 32-33, Ex. A.  In addition, she accepted the Amazon COUs as many as 258 times when she made purchases on Amazon.  Bell Decl. ¶ 3, Ex. A.

**Doug Boswell, J.B.'s and L.B.'s guardian**.  Mr. Boswell was required to agree to Amazon COUs and Alexa Terms at least when he registered an Echo to his account on November 25, 2016; and an Echo Dot on November 29, 2016.  *See* Gillespie Decl. ¶¶ 36-39, Ex. A.  He also registered an Alexa mobile app on an iOS device on August 25, 2018.  *Id.*  In addition, he accepted the Amazon COUs as many as 663 times when he made purchases on Amazon.  Bell Decl. ¶ 3, Ex. A.

**Corey Woodhouse, E.J.'s guardian**.  The Amazon account used by Ms. Woodhouse is registered in the name of her husband, Christopher Woodhouse.  The Woodhouses were required to accept the Amazon COUs and Alexa Terms at least when registering an Echo Dot and Alexa mobile app on June 2, 2019.  *See* Gillespie Decl. ¶¶ 42-45, Ex. A.  They also registered another Alexa mobile app on June 2, 2019.  *Id.*  In addition, the Woodhouses accepted the Amazon COUs

as many as 874 times when they made purchases on Amazon.  Bell Decl. ¶ 3, Ex. A.

**Stephanie Starling, Z.S.'s guardian**.  Ms. Starling was required to accept the Amazon COUs and Alexa Terms at least when she registered an Echo Dot to her account on April 1, 2018. *See* Gillespie Decl. ¶¶ 47-50, Ex. A.  She also registered Alexa mobile apps for iOS on December 22, 2018; and June 20, 2019.  *Id.*  Ms. Starling also separately set up Kid Skills on her Alexa devices.  *See id.* at ¶ 51, Ex. A.  In addition, she accepted the Amazon COUs as many as 119 times when she made purchases on Amazon.  Bell Decl. ¶ 3, Ex. A.

**William Rowe, W.R.'s and L.R.'s guardian**.  Mr. Rowe was required to accept the Amazon COUs and Alexa Terms at least when he registered an Echo to his account on December 25, 2016; and Echo Dots on November 10, 2017; and November 27, 2017.  *See* Gillespie Decl. ¶¶ 54-60, Ex. A.  He also registered Alexa mobile apps for Android on January 24, 2018; February 11, 2019; and March 18, 2019.  *Id.*  In addition, he accepted the Amazon COUs as many as 330 times when he made purchases on Amazon.  Bell Decl. ¶ 3, Ex. A.

**Maria Prunier-Brown, O.B.'s, S.B.'s, F.B.'s, and E.B.'s guardian**.  The Amazon account used to activate the Alexa devices in Ms. Prunier-Brown's home appears to be in the name of a family member.  The user of this account was required to accept the Amazon COUs and Alexa Terms at least when she registered an Echo Dot and Alexa app for iOS on December 25, 2018. *See* Gillespie Decl. ¶¶ 63-67, Ex. A.  She also registered Alexa mobile apps for iOS on April 3, 2019; and June 29, 2019.  *Id.*  In addition, the users accepted the Amazon COUs as many as 12 times when they made purchases on Amazon.  Bell Decl. ¶ 3, Ex. A.

**Erin Shunn, N.S.'s guardian**.  Ms. Shunn was required to accept the Amazon COUs and Alexa Terms at least when she registered an Echo Dot to her account on June 10, 2017.  *See* Gillespie Decl. ¶¶ 70-75, Ex. A.  She also registered Alexa mobile apps for Android on September 17, 2018; October 15, 2018; and July 28, 2019.  *Id.*  Ms. Shunn also separately set up Kids Skills on her Alexa devices.  *Id.* at ¶ 76.  In addition, she accepted the Amazon COUs as many as 173 times when she made purchases on Amazon.  Bell Decl. ¶ 3, Ex. A.

**Matt McLaughlin, S.M.'s and C.M.'s guardian**.  The Amazon account used to activate the Alexa devices in Mr. McLaughlin's home is in the name of his mother, Neva McLaughlin.  Mr.

1  McLaughlin was required to accept the Amazon COUs and Alexa Terms at least when registering

2  an Echo Dot in his name on March 1, 2019.  *See* Gillespie Decl. ¶¶ 78-81, Ex. A.  The McLaughlins

3  also registered Alexa mobile apps for Android on March 12, 2019; and June 5, 2019.  *Id.*  In

4  addition, the McLaughlins accepted the Amazon COUs as many as 722 times they made purchases

5  on Amazon.  Bell Decl. ¶ 3, Ex. A.

6       **Joey Fields, B.F.'s and A.A.'s guardian**.  Joey Fields's Amazon account is also linked to

7  another household Amazon account in the name of her husband, Cedrick Fields.  The Fields were

8  required to accept the Amazon COUs and Alexa Terms at least when registering an Echo on April

9  14, 2017, and an Echo Dot on June 16, 2017.  *See* Gillespie Decl. ¶¶ 84-88, Ex. A.  They also

10  registered Alexa mobile apps for Android on April 18, 2018; and February 25, 2019.  *Id.*  The

11  Fields also separately set up Kid Skills on their Alexa devices.  *Id.* at ¶ 89.   In addition, the Fields

12  accepted the Amazon COUs as many as 211 times when making purchases on Amazon.  Bell Decl.

13  ¶ 3, Ex. A.

14  **ARGUMENT**

15       A court's role in resolving a motion to compel arbitration is "limited to determining (1)

16  whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses

17  the dispute at issue."  *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir.

18  2000).  As described below, the Court should order Plaintiffs to arbitrate their respective claims

19  regarding the Alexa-enabled devices in their homes under the arbitration agreements governing

20  those devices and the principles of equitable estoppel.  As also set forth below, Amazon's

21  arbitration agreement is valid and enforceable (as numerous courts have previously held) and this

22  case plainly falls within the broad scope of disputes covered by that agreement.  However, the

23  Court need not reach the issues of unconscionability or scope, as the arbitration agreement has

24  delegated those issues to the arbitrator.  Once the Court determines that assent to arbitration was

25  given by the account holders for these devices, and that these Plaintiffs are bound to those contracts

26  by principles of equitable estoppel, this case should be dismissed or stayed to permit arbitration to

27  proceed on all other issues.

28

## I.     The Parties' Arbitration Agreement and Class Waiver Provisions are Enforceable

The Federal Arbitration Act (FAA) makes agreements to arbitrate "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  The Act reflects an "emphatic federal policy in favor of arbitral dispute resolution." *KPMG LLP v. Cocchi*, 132 S. Ct. 23, 25 (2011) (per curiam) (internal quotation marks omitted). "[T]he FAA's purpose is to give *preference* (instead of mere equality) to arbitration provisions." *Mortensen v. Bresnan Commc'ns LLC*, 722 F.3d 1151, 1160 (9th Cir. 2013) (emphasis added).  As such, when the claim a plaintiff asserts falls within the scope of a valid arbitration provision, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration.'" *McNamara v. Royal Bank of Scotland Grp., PLC*, No. 11-cv-2137-L (WVG), 2012 WL 5392181, at *3 (S.D. Cal. Nov. 5, 2012) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)) (emphasis in *Dean Witter*).

Since the Supreme Court's decision in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011), it has also been well-settled that class action waivers—and arbitration agreements containing such waivers—are valid and enforceable. *Concepcion*, 131 S. Ct. at 1753; *see also Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2307 (2013) (upholding class action waiver and noting that Rule 23 does not "establish an entitlement to class proceedings for the vindication of statutory rights").  The Ninth Circuit has uniformly recognized that state laws purporting to invalidate arbitration provisions in the name of consumer protection are preempted by the FAA. *See Ferguson v. Corinthian Colls., Inc.*, 733 F.3d 928, 934-36 (9th Cir. 2013) (holding that that the FAA preempted a California rule that invalidated agreements to arbitrate representative claims for public injunctive relief); *see also Mortensen*, 722 F.3d at 1159-60, ("[T]he FAA's command to enforce arbitration agreements trumps any interest in ensuring the prosecution of low-value claims.").  In *Coneff v. AT&T Corp.*, the Ninth Circuit held that the FAA preempted a Washington statute invalidating class action waivers and that the arbitration provision at issue was thus valid and enforceable.  673 F.3d 1155, 1158 (9th Cir. 2012).

The arbitration provision here is not meaningfully distinguishable from provisions found enforceable in these seminal cases.  And courts across the country have found Amazon's provision,

and the class action waiver it contains, to be valid and enforceable. *See Payne*, 2018 WL 4489275 at \*8 (enforcing Amazon's arbitration provision and compelling arbitration); *Ekin v. Amazon Services, LLC*, 84 F. Supp. 3d 1172, 1175 (W.D. Wash. 2014) (same); *Fagerstrom,* 141 F. Supp. 3d at 1057-60, 1064-76 (same); *Peters*, 2 F. Supp. 3d at 1170 (same).  The same is true here.

## II.   The Account Holders for the Alexa Devices at Issue Agreed to Arbitrate Disputes With Amazon.

### A.   Washington Law Governs the COUs and Disputes With Amazon.

The Amazon COUs provide that "the laws of the state of Washington, without regard to principles of conflict of laws, will govern these Conditions of Use and any dispute of any sort that might arise between you and Amazon."  Buckley Decl. Exs. 1-6, "Applicable Law".  Similarly, the Alexa Terms state that "**[a]ny dispute or claim arising from or relating to this Agreement or Alexa is subject to the . . .  governing law. . . and all other terms in the <u>Amazon.com Conditions of Use</u>.**"  Buckley Decl. ¶ 11, Ex. 7 at § 3.6 (bold in original; linking Amazon COUs).  Courts have consistently held that Washington law applies to disputes over Amazon's COUs.  *See, e.g.*, *Fagerstrom*, 141 F. Supp. 3d at 1063–64 (applying Washington rather than California state law, in accordance with the Amazon COUs).  This Court should do the same.[2]

### B.   The Account Holders Assented to Amazon's Arbitration Agreement.

In determining whether a person agreed to arbitrate, courts "apply ordinary state-law

---

[2] In deciding whether to enforce a contractual choice of law provision, Washington courts consider "(1) whether there is an actual conflict of laws and, if so, (2) whether the Agreement's choice-of-law provision, selecting Washington law, is effective." *Erwin v. Cotter Health Centers,* 161 Wash. 2d 676, 692-702 (2007) (holding Washington choice of law provision governed, despite the presence of an actual conflict between California and Washington substantive law).  Washington courts have adopted the test under Section 187 of the Restatement (Second) of Conflict of Laws. *Id.* at 694-95.  Under the Restatement, the law chosen by the parties is effective except in limited circumstances and where "(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." *Id.* (quoting Restatement (Second) of Conflict of Laws § 187 (1971)).  There is no reason to depart from "the usual presumption in favor of enforcement" of the choice of law provision in the COUs here.  *See Payne*, 2018 WL 4489275, at \*4.  Plaintiffs concede that Washington, Amazon's home state, has a "substantial" connection to the dispute (FAC ¶¶ 16-17).  Application of Washington law to the threshold questions of equitable estoppel and arbitrability does not interfere with a fundamental policy of any other state that this lawsuit implicates.

---

principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). In the digital context, the question of assent turns on whether a website puts the customer on "reasonable notice" of its terms and conditions. *See, e.g.*, *Fagerstrom*, 141 F. Supp. 3d at 1068–69. This standard is easily met here, where the holder of each Amazon account Plaintiffs used agreed to Amazon's COUs multiple times. *See, e.g.*, *Selden v. Airbnb, Inc.*, No. 16-CV-00933 (CRC), 2016 WL 6476934, at *5 (D.D.C. Nov. 1, 2016) (holding that user was bound by an arbitration clause, where Airbnb presented a hyperlinked disclosure stating that "By signing up, I agree to Airbnb's Terms of Service" in close proximity to the sign-up buttons); *see also Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 77 (2d Cir. 2017) (vacating lower court's denial of motion to compel arbitration, and holding that the Uber mobile app provided reasonably conspicuous notice of, and that customer unambiguously manifested assent to, Uber's terms of service).

Courts applying Washington law have found that "clickwrap" and "sign-up wrap" agreements—wherein a consumer is informed that clicking a button or "signing in" constitutes assent to an agreement and proceeds to click the button—are fully enforceable. *See, e.g.*, *Doe v. Project Fair Bid Inc.*, No. C11-809 MJP, 2011 WL 3516073, at *4 (W.D. Wash. Aug. 11, 2011) ("This kind of 'clickwrap' agreement has been upheld in several cases in this circuit and elsewhere."); *Hauenstein v. Softwrap Ltd.*, No. C07-0572MJP, 2007 WL 2404624, at *2-3, 6 (W.D. Wash. Aug. 17, 2007) (enforcing arbitration agreement because plaintiff "manifested his assent to the License Agreement by 'clicking' the appropriate box"). Many courts have specifically found that when a hyperlink to terms of use is provided near a "purchase" or "sign in" button, and the user is informed that purchasing or signing in constitutes acceptance of those terms, the user does in fact provide assent to the terms by proceeding to click the "purchase" or "sign-in" button. *See Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 835 (S.D.N.Y. 2012) (enforcing forum selection clause based on disclosure below "Sign Up" button); *Starke v. Gilt Groupe, Inc.*, No. 13 CIV. 5497 LLS, 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24, 2014) (enforcing arbitration clause, noting that plaintiff "was directed exactly where to click in order to review those terms, and his decision to click the 'Shop Now' button represents his assent to them"); *accord Selden*, 2016 WL

6476934 at *5 (collecting cases).  Indeed, assent to hyperlinked terms is the predominant way that users agree to terms in the modern online world; long gone are the days when the average, reasonable consumer can claim ignorance of how clickwrap and sign-up wrap works.  Here, the Parents and members of households whose Amazon accounts were used to activate the Alexa devices at issue each effectively assented to the Amazon arbitration agreement in multiple ways.

**_Registration of Alexa App._**  The account holders of the Alexa devices at issue assented to the Amazon arbitration agreement when they activated their devices by registering the Alexa app.  To activate the Alexa service using a mobile device, a user must sign in to the Alexa app using his or her Amazon account.  Young Decl. ¶¶ 4-6.  As depicted above (page 4), when signing in to the Alexa app on a device, the user is notified that by continuing in the process of activating Alexa, the user agrees to the Amazon COUs and the Amazon privacy policy, both of which are hyperlinked in the sign-in screen.  Young Decl. ¶¶ 5-6.   A user cannot proceed with signing into the Alexa app without agreeing to the COUs.  _Id._

**_Activation of Alexa Devices._**  The account holders also agreed to the Amazon COUs and Alexa Terms when they added Alexa-enabled smart-speaker device, such as the Echo or Echo Dot, to their accounts.   When the users added an Echo device, either through the Alexa app or alexa.amazon.com website, they were presented with the statement: "By proceeding, you agree to Amazon's <u>Conditions of Use</u> and all the terms found <u>here</u>" immediately above the device they chose to add.  The "<u>Conditions of Use</u>" language is a hyperlink; if the user taps it, he or she will be immediately directed to the Amazon COUs in effect at that time as well as to the Alexa Terms, each including the Amazon arbitration provision.  Young Decl. ¶¶ 9-12, Exs. A-B.

Place your order

By placing your order, you agree to Amazon's privacy notice and conditions of use.

**_Standard Checkout Flow on Amazon._**  When a customer makes a purchase from Amazon using its standard desktop checkout page, Amazon displays a hyperlinked notice on the page informing the customer that, by completing the purchase, he or she is agreeing to the Amazon COUs.  Buckley Decl. ¶¶ 24-25, Ex. 20.  To place an order in this process, Amazon requires a

customer to click a button, which reads "Place your order," directly next to a statement hyperlinking to the Amazon COUs and indicating that the user agrees to those conditions by proceeding.

Multiple courts have examined this checkout flow and concluded that it provides sufficient notice of the Amazon arbitration agreement. *See Payne*, 2018 WL 4489275 at *5 (holding that "a reasonably prudent offeree would know that he agreed to Amazon's Conditions of Use by clicking the 'Place your order' button" on Amazon standard checkout page) (collecting cases); *McKee v. Audible, Inc.*, No. CV 17-1941-GW(EX), 2017 WL 4685039, at *11 n.7 (C.D. Cal. July 17, 2017) ("the disclosure and hyperlink that appear on the Amazon checkout page are of the same nature as those upheld in courts across multiple districts, including those applying Washington law"); *accord Wiseley*, 709 F. App'x 862 at 864 ("The notices on Amazon's checkout and account registration pages, which alerted [plaintiff] that clicking the corresponding action button constituted agreement to the hyperlinked COU, were in sufficient proximity to give him a 'reasonable opportunity to understand' that he would be bound by additional terms.").

The account holders of the Alexa devices at issue each assented to the Amazon arbitration agreement, most of them tens or hundreds of times, by using the Amazon standard checkout flow. *See* Bell Decl. ¶ 3 and Ex. A, Buckley Decl. ¶¶ 24-25, Ex. 20. This assent, in addition to the Alexa sign up flow, binds each account holder to the Amazon arbitration provisions.

### III.   Plaintiffs Cannot Avoid the Arbitration Agreements Their Parents Entered When They Registered the Alexa Devices They Allowed Their Children to Use.

Plaintiffs, as well as their Parents, are required to arbitrate their claims under the agreements between Amazon and the Parents, who authorized their children's use of Alexa devices and brought this suit on their children's behalf. Under ordinary contract and agency principles, a person who did not sign an arbitration agreement may nonetheless be bound by it. *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006). Those principles apply here.

"The United States Supreme Court has held that a litigant who is not a party to an arbitration agreement may invoke arbitration under the [Federal Arbitration Act ("FAA")] if the relevant state contract law allows the litigant to enforce the agreement." *Kramer v. Toyota Motor*

*Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013) (applying California equitable estoppel law), *citing Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (holding state law governs whether an arbitration agreement is enforceable by or against a nonsignatory under the FAA). Similarly, a party to an arbitration agreement can require a nonsignatory to arbitrate disputes where the contract is enforceable against the nonsignatory under state law contract principles. *Arthur Andersen LLP*, 556 U.S. at 631.

Washington law recognizes that an arbitration agreement may bind nonsignatories under the principle of equitable estoppel. Equitable estoppel "precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Townsend II*, 173 Wash. 2d at 461 (requiring children to arbitrate tort and all other claims against homebuilder under agreement entered by parents) (quoting *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1045-46 (9th Cir. 2009)). The principle ensures fairness by estopping "a party from asserting rights he otherwise would have had against another when his own conduct renders assertion of those rights contrary to equity." *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000) (affirming grant of motion to compel arbitration against nonsignatory based on equitable estoppel).

In the arbitration context, equitable estoppel generally applies in two circumstances. First, "equitable estoppel may require a nonsignatory to arbitrate a claim if that person, despite never having signed the agreement, knowingly exploits the contract in which the arbitration agreement is contained." *Townsend II*, 173 Wash. 2d at 461 (internal citations, quotations, and alterations omitted); *see also Payne*, 2018 WL 4489275 at *6-7 (holding that Amazon arbitration agreement bound nonsignatory plaintiff because she "knowingly exploited" fiancé's contractual agreement with Amazon by receiving goods he purchased through Amazon). Second, "a signatory may be required to arbitrate a claim brought by a nonsignatory where the subject matter of the dispute is intertwined with the contract providing for arbitration, and the nonsignatory and signatory parties have a close relationship." *E. W. Bank v. Bingham*, 992 F. Supp. 2d 1130, 1133 (W.D. Wash. 2014) (Jones, J.) (citing *Mundi*, 555 F.3d at 1046) (holding that equitable estoppel was unwarranted in that case given lack of a close relationship between signatory and nonsignatory

defendants and lack of intertwining of contract with claims); *cf. Townsend v. Quadrant Corp.* ("*Townsend I*"), 153 Wash. App. 870, 889 (2009), *aff'd on other grounds*, 173 Wash. 2d 451 (2012) (holding that nonsignatory parent companies could enforce arbitration agreement of subsidiary-builder, where claims against all defendants were based on the "same facts" and were "inherently inseparable").  Both principles apply here.

### A.   Plaintiffs Have Exploited the Benefits of Their Parents' Agreements That Permitted Their Use of the Alexa Devices.

Plaintiffs were able to access the benefits of Alexa because their signatory Parents, through whom they bring this suit, (or household members) bought and installed Alexa devices, agreed to the Amazon COUs and Alexa Terms, enabled Alexa on those conditions in their households, and then permitted the children to use those devices.  It would eviscerate the core function of the arbitration agreements (and offend basic notions of fairness) to permit those same parents to avoid them by bringing suits through the children who are their charges and whom they enabled to use the Alexa devices.

The Washington Supreme Court's ruling in *Townsend II* illustrates the equitable principles that bar resort to such gamesmanship to avoid arbitration agreements.  In *Townsend II*, plaintiff homeowners and their children brought claims for unfair business practices, fraud, negligence, negligent misrepresentation, and rescission (among others) against a defendant homebuilder and its parent companies based on shoddy workmanship.  173 Wash. 2d at 454.  The builder and its parent companies moved to compel arbitration based on agreements with each homeowner.  *Id.* Considering whether the homeowners' children were "bound by the arbitration clause to the same extent as their parents," the *Townsend II* court held the children were equitably estopped from avoiding arbitration because they "received the benefit of the bargain in the transaction with [the builder] to the same extent as their parents."  *Id.* at 460-62.  The same rationale applies here: the plaintiffs admittedly received substantial benefits through the Alexa service, and they cannot shrug off the obligations that are part-and-parcel of it.

Building on *Townsend II*, the court in *Payne*, 2018 WL 4489275, granted a motion to compel arbitration as to a nonsignatory plaintiff who received as a gift a pair of glasses purchased

by her fiancé through Amazon. The *Payne* court saw "no meaningful difference" between *Townsend II* and the facts there, or between "the receipt of an injurious house and the receipt of an injurious pair of glasses." *Id.* at *7. And it concluded that "like the children in" *Townsend II*, the nonsignatory plaintiff in *Payne* was "attempting to avoid the burden of arbitration while retaining the benefit of rights based on" her fiancé's contractual relationship with Amazon, warranting the application of equitable estoppel. *Id.*

Applying similar logic, the *Nicosia* court granted a motion to compel against a nonsignatory plaintiff who used his wife's Amazon account based on a "derivative rights" theory. *Nicosia*, 384 F. Supp. 3d at 272. The *Nicosia* court found that the Amazon arbitration agreement bound third parties that used the Amazon account. *Id.* at 272-74. Because the plaintiff received "direct benefits" through his wife's relationship with Amazon, the court held that he could not avoid the Amazon arbitration agreement. *Id.* at 274 (applying Washington state law, and citing *Townsend II*, 173 Wash.2d at 461, among other cases).

There is no meaningful difference between this case and *Townsend II*, *Payne*, or *Nicosia*. Plaintiffs' Parents purchased Alexa devices for Plaintiffs' use and enjoyment. *cf. Payne*, 2018 WL 4489275 at *7. Plaintiffs' Parents then registered the Alexa devices to their Amazon accounts and expressly agreed that the Amazon COUs and Alexa Terms, which both include an arbitration agreement, would apply to their household's use of the devices. *See generally* Gillespie Decl.; *cf. Nicosia*, 384 F. Supp. 3d at 272-74. As summarized above and detailed in the Gillespie Declaration, some Parents activated multiple devices, put devices in their kids' rooms, and expressly approved of Plaintiffs' use of child-directed Kid Skills on their devices. Plaintiffs were permitted by their parents to use these devices "regularly" and on "several occasions" for a wide array of applications, including playing music, telling stories and jokes, playing games, finding information, answering trivia questions, checking the weather, helping with homework, etc. *See* FAC at ¶¶ 45, 57, 63, 69, 75, 81, 87, 93 99, 105, 111. Plaintiffs claim they triggered the recording of their voices by first invoking the wake word (e.g., "Alexa") and then querying the service over the internet as intended. Having knowingly enjoyed the benefits of the Alexa service, and with it the contractual relationship the Parents entered with Amazon to obtain that service, Plaintiffs and

their Parents cannot choose to avoid only the arbitration obligations in their agreements. Accordingly, Plaintiffs "must also be held to the arbitration clause that governs that relationship." *Nicosia*, 384 F. Supp. 3d at 275.

Failure to hold Plaintiffs to the same arbitration agreement that binds the account holder— when any right a Plaintiff here has to use the Amazon account or Alexa service is merely derivative of the Parent's right—"would eviscerate the arbitration agreement." *See PRM Energy Sys., Inc. v. Primenergy, LLC*, 592 F.3d 830, 834 (8th Cir. 2010) (potential nonsignatory licensee could compel arbitration pursuant to licensor-licensee agreement "under agency and related principles" because, absent enforcement of arbitration rights, agreement would be meaningless); *accord J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir. 1988) ("If the parent corporation was forced to try the case, the arbitration proceedings would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted."). There is no serious dispute that the Parents, and/or in some cases other household members, assented to and are bound by their arbitration agreements with Amazon. *See* Section II, *above*. Nor is there any doubt that those agreements would bar any lawsuit the Parents sought to bring on their own behalf based on the same state statutes.

Equity does not allow Plaintiffs to ignore the agreements their Parents entered by bringing this lawsuit in court, especially where the suit is brought through the very Parents that agreed to resolve all disputes in individual binding arbitration.

### B. Plaintiffs' Claims Are Intertwined with Their Guardians' Agreements With Amazon.

Plaintiffs should be required to arbitrate their claims against Amazon for the additional reason that their claims are intertwined with the Amazon COUs and Alexa Terms their Parents entered. While this equitable principle has been articulated in the context of nonsignatories seeking to compel a signatory to arbitrate claims against it, the principles apply with the same force here. First, Alexa cannot be used without an Amazon account holder—here, the Parents or other household members—expressly entering the COUs and Alexa Terms. *See generally* Young Decl. Each version of the Alexa Terms state that "If you do not accept the terms of this Agreement, then

1   you may not use Alexa." Buckley Decl. Exs. 7-19 at 1.

2   Second, the crux of Plaintiffs' allegations—that their voices were recorded without their

3   consent—is completely intertwined with provisions in the Alexa Terms providing that Alexa

4   users' voices are recorded and retained by Amazon. *See, e.g.*, Buckley Decl. Exs. 7-19 at § 1.3

5   (e.g., "Alexa streams audio to the cloud when you interact with Alexa.  Amazon processes and

6   retains your Alexa Interactions, such as your voice inputs . . . ."); Exs. 10-16 at "Alexa Calling and

7   Messaging Schedule"; Exs. 17-19 at "Alexa Communication Schedule."  Through the COUs,

8   Plaintiffs' guardians agreed that they are responsible for access to their accounts and for overseeing

9   minors' use of their accounts, which necessarily include their use of Alexa:

10          You are responsible for maintaining the confidentiality of your
            account and password and for restricting access to your account,
11          ***and you agree to accept responsibility for all activities that occur
            under your account or password.*** Amazon does sell products for
12          children, but it sells them to adults, who can purchase with a credit
            card or other permitted payment method. ***If you are under 18, you
13          may use the Amazon Services only with involvement of a parent
            or guardian.*** Parents and guardians may create profiles for
14          teenagers in their Amazon Household.

15   Buckley Decl. Ex. 6 "Your Account" (emphasis added); *see also id.* at Exs. 1-5.  Plaintiffs' claims

16   in this action each depend on proof, as a critical element of their claim, that their voices were

17   recorded without their consent.  Their claims are thus inextricably intertwined with the contracts

18   through which their Parents provided consent to recording and agreed to oversee the Plaintiffs' use

19   of these devices.

20   There also can be no serious dispute that Plaintiffs have a close relationship with the

21   signatories to the arbitration agreements, who are their Parents, guardians and household family

22   members.  That those very persons bought the Alexa devices Plaintiffs used, set them up in their

23   homes and allowed Plaintiffs to use them establishes that "close relationship."  That the Parents

24   bring this suit on behalf of the Plaintiffs further underscores their close relationship.

25   Accordingly, Plaintiffs should be required to arbitrate these claims under the agreements

26   their Parents entered.

27

28

IV.    **The Amazon COUs Delegate All Other Questions Concerning Arbitrability to the Arbitrator, and Not the Court.**

Once a court recognizes a valid arbitration agreement, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *see also Peters*, 2 F. Supp. 3d at 1170, *aff'd*, 669 F. App'x 487 (9th Cir. 2016) (noting that parties' intentions "are generously construed as to issues of arbitrability"). "The clear weight of authority holds that the most minimal indication of the parties' intent to arbitrate must be given full effect . . . ." *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 478 (9th Cir. 1991); *accord Fagerstrom*, 141 F. Supp. 3d at 1063-64 (quoting *Republic of Nicaragua* and ordering arbitration based on similar provision in Amazon COUs). To do otherwise contravenes the "presumption of arbitrability" that applies whenever there is a contract that contains an arbitration clause. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986); *see also The Council of Cty. & City Employees, AFSCME, AFL-CIO v. Spokane Cty.*, 32 Wash. App. 422, 425 (1982) (applying Washington law) ("There is a strong presumption in favor of arbitrability; all questions upon which the parties disagree are presumed to be within the arbitration provisions unless negated expressly or by clear implication."). In other words, courts should compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute . . . ." *AT&T Techs., Inc.*, 475 U.S. at 650.

The standard is even lower where, as here, the parties agreed that the arbitrator should decide issues of arbitrability. "Just as a court may not decide a merits question that the parties have delegated to an arbitrator, a court may not decide an arbitrability question that the parties have delegated to an arbitrator." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (holding that delegation clause in arbitration agreement precludes court from examining questions of arbitrability, even where opponent of arbitration asserts that claim of arbitration rights are "wholly groundless"). Courts have recognized that because the rules of the American Arbitration Association include delegation of arbitrability to the arbitrator, when an arbitration agreement incorporates those rules by reference, "the parties agreed to grant the

arbitrators presiding over their individual arbitrations the authority to determine the arbitrability of their claims." *G.G. v. Valve Corp.*, No. C16-1941-JCC, 2019 WL 1354152, at *3 (W.D. Wash. Mar. 26, 2019) (denying plaintiff's challenge to arbitrability of claims on behalf of minor children, where agreements incorporated AAA rules). Indeed, "[v]irtually every circuit to have considered the issue has determined that incorporation of the American Arbitration Association's (AAA) arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074-75 (9th Cir. 2013) (collecting cases and holding that "incorporation of the UNCITRAL arbitration rules is clear and unmistakable evidence that the parties agreed the arbitrator would decide arbitrability"). Arbitrability concerns disputes over the scope of an arbitration agreement and refers to "a term of art covering disputes about [1] whether the parties are bound by a given arbitration clause as well as disagreements about [2] whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." *Cartagena Enterprises, Inc. v. J. Walter Thompson Co.*, No. 13 CIV. 4238 SAS, 2013 WL 5664992, at *2-4 (S.D.N.Y. Oct. 16, 2013) (compelling plaintiff to arbitrate the issues of arbitrability).

The arbitration provision in the Amazon COUs incorporate by reference the AAA rules. It provides in relevant part that "[t]he arbitration will be conducted by the American Arbitration Association (AAA) under its rules, including the AAA's Supplementary Procedures for Consumer-Related Disputes." *See* Buckley Decl. ¶¶ 4, 10, Exs. 1-6 at "Disputes." The provision further states that "[t]he AAA's rules are available at www.adr.org or by calling 1-800-778-7879." *Id.* This incorporation is "clear and unmistakable" evidence that parties to the arbitration agreement delegated all questions concerning the arbitrability of this lawsuit to the arbitrator. *See Oracle v. Myriad Grp. A.G.*, 724 F.3d at 1074-75; *Crook v. Wyndham Vacation Ownership, Inc.*, 13-cv-03669, 2013 WL 11275036, at *5 (N.D. Cal. Nov. 7, 2013). Because the Amazon COUs give an arbitrator—and not this Court—the authority to decide "gateway" questions of "arbitrability," including whether this dispute falls within the scope of the arbitration agreement, the Court should leave all such questions to the arbitrator. *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010).

**V.   Even Absent the Delegation Agreement, This Dispute Falls Within the Scope of the Amazon Arbitration Agreement and is Not Unconscionable.**

    **A.   The Dispute is Within the Broad Scope of the Arbitration Agreement.**

The arbitration agreement in the Amazon COUs is broad and applies to "[a]ny dispute or claim relating in any way to your use of any Amazon Service, or to any products or services sold or distributed by Amazon or through Amazon.com . . . ."  Buckley Decl. ¶¶ 4, 10, Exs 1-6. Similarly, the Alexa Terms state that "[a]ny dispute or claim arising from or relating to this Agreement or Alexa is subject to the binding arbitration" terms "in the <u>Amazon.com Conditions of Use</u>."  *Id.* at ¶ 11, Exs. 7-19 at § 3.6.  Thus, if this Court concludes that it must reach this issue (it need not), the "broad and far reaching" language of these arbitration clauses "leaves little doubt that the dispute [here] is subject to arbitration."  *Chiron*, 207 F.3d at 1131 (ordering arbitration as breadth of arbitration agreement and federal policy favoring arbitration embodied in the Federal Arbitration Act "leaves no place for the exercise of discretion by a district court") (internal quotations and citations omitted); *see also In re Verisign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1224 (N.D. Cal. 2007) (holding that arbitration agreement that covered "any other services provided by . . . KPMG," and disputes involving "any entity for whose benefit the services in question are or were provided" had broad scope and *retroactive effect*).  Courts examining the substantially identical Amazon arbitration agreement have found that its use of "any dispute" language gave the agreement broad scope: "[W]hen arbitration agreements contain broad 'relating to any dispute' language, both future and past disputes are included in the scope of the arbitration agreement."  *Ekin*, 84 F. Supp. 3d at 1178; *see also Peters*, 2 F. Supp. 3d at 1173 (same with Amazon business services agreement).

This lawsuit falls within the broad scope of the arbitration agreements under the Amazon COUs and the Alexa Terms.  None of Plaintiffs' claims arise from anything other than their respective use of the Alexa service.  They thus relate to "use of any Amazon Service" within a pertinent household.  Moreover, the Echo and Echo Dot devices that each Plaintiff used are "products or services sold or distributed by Amazon or through Amazon.com," and thus Plaintiffs' claims concerning those products fall within the unambiguous scope of the arbitration agreement.

Buckley Decl. ¶¶ 4, 10, Exs. 1-6 at "Disputes"; *cf. Payne*, 2018 WL 4489275 at \*5 (holding that arbitration agreement applied to dispute concerning allegedly defective eclipse glasses purchased through Amazon).

### B.    The Agreement is Not Unconscionable.

When a Plaintiff attempts to avoid arbitration by asserting that the arbitration provision at issue is unconscionable, when, as here, questions of arbitrability have been delegated to the arbitrator, this issue is one for the arbitrator to decide. *Rent-A-Ctr., W.*, 561 U.S. at 68–69 (only unconscionability challenges directed at the delegation clause may be considered by the Court). But even if not delegated, there is no unconscionability here. The party asserting unconscionability bears the burden of putting forth facts to prove it. *Mortensen*, 722 F.3d at 1157 ("As arbitration is favored, those parties challenging the enforceability of an arbitration agreement bear the burden of proving that the provision is unenforceable."). The parties' agreement here is neither procedurally nor substantively unconscionable.

Procedural unconscionability refers to the lack of meaningful choice," including "the manner in which the contract was entered, whether each party had a reasonable opportunity to understand the terms of the contract, and whether the important terms were hidden in fine print." *Brinkley v. Monterey Fin. Servs., Inc.*, 242 Cal. App. 4th 314, 336 (2015) (applying Washington law). The fact that a consumer contract is a contract of adhesion does not render it procedurally unconscionable. *See Concepcion*, 563 U.S. at 346-47 (enforcing arbitration provision in an adhesion contract, noting "the times in which consumer contracts were anything other than adhesive are long past."). To the contrary, "[s]tandardized adhesion contracts are necessary in a busy, commercial society." *Nicosia*, 384 F. Supp. 3d at 264.

Here the account holders for the Alexa devices at issue had a meaningful opportunity to understand the terms of the contract. Amazon presented the terms of its COUs, including its arbitration provision, to the account holders when they created their Amazon accounts, when they registered the Alexa-enabled devices, when they registered the Alexa app on their mobile devices, and every time they made a purchase on through the Amazon checkout page, which some Plaintiffs' Parent account holders did multiple—in some cases, hundreds—of times after activating

Alexa devices in their homes. *See* Bell ¶ 3, Ex. A. Plaintiffs cannot credibly argue that the important terms are in "fine print," as Amazon highlights the arbitration provision with bold text—both in the COUs themselves and within the Alexa Terms. Buckley Decl. ¶¶ 4, 10, 11, Exs. 1-6 at "Disputes," Exhs. 7-19 at § 3.6. Far from burying the arbitration provisions in fine print, Amazon specifically emphasized these terms within its COUs and Alexa Terms.

The agreement is also not substantively unconscionable. "A term is substantively unconscionable where it is one-sided or overly harsh, shocking to the conscience, monstrously harsh, or exceedingly calloused." *Gandee v. LDL Freedom Enters., Inc.*, 176 Wash.2d 598, 603 (2013) (internal citations and punctuation omitted). Amazon's arbitration provision is none of these things: It provides that Amazon will pay all arbitration fees for claims less than $10,000, and provides that the consumer may choose whether to arbitrate in their home jurisdiction, or exclusively by phone appearances and written submissions. Buckley Decl. ¶¶ 4, 10, Exs. 1-6 at "Disputes." If anything, these provisions compare favorably to court proceedings, where customers might be required to pay their own fees (which could eclipse the amount of relief sought for smaller claims) and be compelled to give testimony. Recognizing these even-handed terms, courts have routinely rejected the argument this arbitration provision is unconscionable. *See Payne*, 2018 WL 4489275 at *8 (finding that arbitration provision was not unconscionable); *Fagerstrom*, 141 F. Supp. 3d at 1064-76 (same); *Peters*, 2 F. Supp. 3d at 1170 (same).

## CONCLUSION

Under the FAA, once the Court determines that Plaintiffs' claims are referable to arbitration, it shall at bare minimum stay proceedings. 9 U.S.C. § 3. In the alternative, "the Ninth Circuit has made clear that § 3 does not limit the court's authority to grant a dismissal where the language contained in the arbitration provision is sufficiently broad to bar all of plaintiff's claims." *Veritas Constr., Inc. v. LBG 38, LLC*, No. C16-1811-JCC, 2017 WL 347476, at *1 (W.D. Wash. Jan. 24, 2017) (internal citations and quotations omitted). As established above, all of Plaintiffs' claims are arbitrable. Amazon therefore requests that the Court grant Amazon's motion to compel arbitration, order all claims in this action to individualized binding arbitration, and dismiss this action or stay all proceedings pending completion of arbitration.

1    Dated:    September 12, 2019                Respectfully submitted,

2                                               FENWICK & WEST LLP

3

4                                               By:  s/Jeffrey A. Ware
                                                     Jeffrey A. Ware, WSBA No. 43779

5                                               1191 Second Avenue, 10th Floor
                                                Seattle, WA  98101
6                                               Telephone:  206.389.4510
                                                Facsimile:   206.389.4511
7                                               Email:       jware@fenwick.com

8                                               Laurence F. Pulgram (admitted *pro hac vice*)
                                                Tyler G. Newby (admitted *pro hac vice*)
9                                               Molly R. Melcher (admitted *pro hac vice*)
                                                Armen N. Nercessian (admitted *pro hac vice*)
10                                              Avery L. Brown (admitted *pro hac vice*)
                                                Mary M. Griffin (admitted *pro hac vice*)
11                                              FENWICK & WEST LLP
                                                555 California Street, 12th Floor
12                                              San Francisco, CA 94104
                                                Telephone:  415.875.2300
13                                              Facsimile:   415. 281.1350
                                                Email:       lpulgram@fenwick.com
14                                                           tnewby@fenwick.com
                                                             mmelcher@fenwick.com
15                                                           anercessian@fenwick.com
                                                             avery.brown@fenwick.com
16                                                           mgriffin@fenwick.com

17                                              *Attorneys for Defendants*
                                                AMAZON.COM, INC. and
18                                              A2Z DEVELOPMENT CENTER, INC.

19

20

21

22

23

24

25

26

27

28

AMAZON'S MOT. TO COMPEL ARB.              - 25 -            FENWICK & WEST LLP
CASE NO.: 2:19-CV-910-RAJ-MLP                              1191 SECOND AVENUE, 10TH FLOOR
                                                            SEATTLE, WASHINGTON  98101

1

**CERTIFICATE OF SERVICE**

2

I, Jeffrey Ware, hereby certify that on August 7, 2019, I caused the foregoing

3

**DEFENDANTS' MOTION TO COMPEL ARBITRATION AND TO DISMISS**

4

**PLAINTIFFS' CLAIMS** to be served on the following parties as indicated below:

| | |
|---|---|
| 5<br><br>6<br><br>7<br><br>8<br><br>9<br><br>10<br><br>11<br><br>12<br><br>13<br><br>14<br><br>15<br><br>16<br><br>17<br><br>18<br><br>19<br><br>20<br><br>21<br><br>22<br><br>23<br><br>24 | Lauren Hudson, WSBA No. 55124<br>QUINN EMANUEL URQUHART &<br>SULLIVAN LLP<br>600 University St., Ste. 2800<br>Seattle, WA  98101<br>laurenhudson@quinnemanuel.com<br><br>Andrew H. Schapiro (*pro hac vice*)<br>Stephen Swedlow (*pro hac vice*)<br>QUINN EMANUEL URQUHART &<br>SULLIVAN LLP<br>191 N. Wacker Drive, Suite 2700 Chicago, IL<br>60606 Tel: 312.705.7400 Fax: 312.705.7401<br>andrewschapiro@quinnemanuel.com<br>stephenswedlow@quinnemanuel.com<br><br>Ashley C. Keller (*pro hac vice*)<br>Travis D. Lenkner (*pro hac vice*)<br>J. Dominick Larry (*pro hac vice*)<br>KELLER LENKNER LLC<br>150 N. Riverside Plaza, Ste. 4270<br>Chicago, IL 60606<br>Tel.: 312.741.5220<br>Fax: 312.971.3502<br>ack@kellerlenkner.com<br>tdl@kellerlenkner.com<br>nl@kellerlenkner.com<br><br>Warren D. Postman (*pro hac vice*)<br>KELLER LENKNER LLC<br>1300 Street N.W., Suite 400E<br>Washington, D.C.<br>Tel.: 202.749.8334<br>Fax: 312.971.3502<br>wdp@kellerlenkner.com<br><br>*Attorneys for Plaintiff and the Putative Class* | [  ]  By United States Mail<br>[  ]  By Legal Messenger<br>[X]  By Electronic CM/ECF<br>[  ]  By Overnight Express Mail<br>[  ]  By Facsimile<br>[  ]  By Email [by agreement of counsel] |

25

Dated:  September 12, 2019

By: *s/* Jeffrey A. Ware

26

For Jeffrey A. Ware, WSBA No. 43779
FENWICK & WEST LLP

27

28