UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| B.F. and A.A., minors, by and through their guardian Joey Fields, et al., | |
| Plaintiffs, | Case No. C19-910-RAJ-MLP |
| v. | REPORT AND RECOMMENDATION |
| AMAZON, a Delaware corporation, and A2Z DEVELOPMENT CENTER, INC., a Delaware corporation, | |
| Defendants. | |

## I.      INTRODUCTION AND SUMMARY CONCLUSION

This matter comes before the Court on the motion of Amazon.com, Inc. and A2Z Development Center, Inc. ("Defendants" or "Amazon") to compel arbitration and dismiss Plaintiffs' claims in this putative class action. (Dkt. # 55 (Amazon's Motion to Compel Arbitration ("MTC")).) This case involves the claims of twenty-three children ("Plaintiffs"), who are suing Amazon through their twelve respective parents as legal guardians (the "parents"), alleging that Amazon's Alexa service on devices in their homes recorded their confidential communications in violation of the laws of eight states. (Dkt. # 24 (First Amended Class Action

Complaint ("FAC")) at ¶¶ 38-41, 129-32, 142-45, 155-58, 168-71, 181-84, 194-97, 207-10, 220-23.)[1]

In the instant motion to compel arbitration, Defendants argue that Plaintiffs cannot evade their parents' agreements to arbitrate all disputes with Amazon, and that principles of equitable estoppel under Washington law prevent Plaintiffs from obtaining the benefit of Amazon's Alexa services without complying with the valid arbitration agreements. Plaintiffs respond that they are nonsignatories bringing only statutory claims against Amazon, and therefore Plaintiffs – unlike their parents – are not bound by the arbitration provisions of their parents' contractual agreements with Amazon. (Dkt. # 68 (Plaintiffs' Opposition to Motion to Compel ("Opp'n")) at 5.) The Court, having considered the parties' submissions, the oral arguments of counsel at the hearing on October 17, 2019, the applicable law, and the balance of the record, hereby recommends that Amazon's motion to compel arbitration be DENIED for the reasons discussed below.

## II.   DISCUSSION

A.  Background and Relevant Contractual Provisions

Amazon operates the Alexa Voice Service, which lets users who agree to the applicable terms access various Amazon services by speaking instead of typing. (Dkt. # 57 ("Young Decl.") at ¶¶ 2-3.) Amazon offers Alexa services through several means, including smart speakers such as the Amazon Echo and Amazon Echo Dot, mobile iOS and Android applications, and some third-party services (collectively "Alexa-enabled devices"). (*Id.*)

As noted above, Plaintiffs are twenty-three children who regularly used the Alexa

---

[1] Plaintiffs seek to bring their claims on behalf of themselves and all other similarly situated minors who have used Alexa-enabled devices in their homes in Florida, Illinois, Massachusetts, Maryland, Michigan, New Hampshire, Pennsylvania, and Washington.

1    devices identified in the FAC without personally purchasing the devices or setting them up.

2    (FAC at ¶¶ 38-113.) All Plaintiffs allege that their home contained between one and a dozen

3    Amazon Echos, Amazon Dots, or other Alexa devices between 2015 and 2019. (FAC at ¶¶ 43,

4    49, 55, 61, 67, 73, 79, 85, 91, 97, 103, 109.) It is undisputed that because Plaintiffs are not

5    account holders with Amazon, they did not personally enter into any contractual agreement with

6    Amazon before using the Alexa devices at issue. (MTC at 11 ("Each of Plaintiffs' Parents agreed

7    to the Amazon COUs and the arbitration provision when they created their Amazon accounts and

8    when they register the Alexa-enabled devices that Plaintiffs used"); Opp'n at 7.) Rather, each of

9    the Plaintiffs' parents (or other account holders in the home) agreed to Amazon's terms and

10   conditions as part of setting up the Alexa-enabled devices. (MTC at 11-14.)

11        Once an Alexa device is set up, Amazon allows any individual (regardless of whether

12   they are an account holder) to use Alexa without creating an account. To use Alexa, any person

13   in proximity to an Alexa-enabled device simply needs to say the device's "wake word," such as

14   "Alexa" or "Echo." (FAC at ¶¶ 27-28; Young Decl. at ¶ 2.) This means that registered or

15   unregistered users alike can interact freely with Alexa. Whenever any user accesses an Alexa

16   device by using a wake word, Amazon makes, stores, and analyzes permanent recordings of their

17   conversations. (FAC at ¶¶ 38-113; MCT at 55 (". . . Alexa's recording function is integral to its

18   ability to respond to directions . . . ."); Dkt. # 56 ("Buckley Decl."), Exs. 7-19 ("Alexa streams

19   audio to the cloud when you interact with Alexa. Amazon processes and retains your Alexa

20   interactions, such as your voice inputs . . . ").) It is this recording of voice inputs that Plaintiffs

21   are challenging in this lawsuit. Plaintiffs have brought statutory claims under the laws of their

22   eight respective states, arguing that Amazon recorded their confidential communications without

23

their consent and that Plaintiffs had a reasonable expectation that their statements would not be recorded. (FAC at ¶¶ 129-232.)

It is undisputed that Plaintiffs' parents accepted Amazon's Conditions of Use ("COUs") when they set up the device. Amazon's COUs include an arbitration clause, and Alexa's Terms of Use ("Alexa Terms") as part of their contractual agreements with Amazon. Specifically, the Amazon COUs have contained an arbitration agreement with a class action waiver provision since 2011. (Buckley Decl. at ¶ 4.) The arbitration provision in effect in 2014 (when Alexa first launched) provided as follows:

> Any dispute or claim relating in any way to your use of any Amazon Service, or to any products or services sold or distributed by Amazon or through Amazon.com will be resolved by binding arbitration, rather than in court.

(*Id.*, Ex. 1 (Dec. 5, 2012 COUs) at "Disputes".) In addition, the COUs provide as follows:

> If you use any Amazon Service, you are responsible for maintaining the confidentiality of your account and password and for restricting access to your computer, and you agree to accept responsibility for all activities that occur under your account or password. Amazon does sell products for children, but it sells them to adults, who can purchase with a credit card or other permitted payment method. If you are under 18, you may use the Amazon Services only with involvement of a parent or guardian. Alcohol listings on Amazon are intended for adults. You must be at least 21 years of age to purchase alcohol, or use any site functionality related to alcohol. Amazon reserves the right to refuse service, terminate accounts, remove or edit content, or cancel orders in its sole discretion.

(*Id.* at "Your Account".)

To activate Alexa, a user must have an Amazon account and link the Alexa device to that account during the registration process. (Young Decl. at ¶ 4.) During this registration process, users agree to Amazon's COUs. (*Id.* at ¶¶ 5-12.) Thus, a user must agree to Amazon's COUs during the set-up process of any Alexa device. (*Id.* at ¶¶ 5-8.) Similarly, users must also agree to Alexa's Terms of Use ("Alexa Terms") when they first activate their Alexa device. (*Id.* at ¶¶ 7-8, 10-11.) The Alexa Terms provide as follows:

> Any dispute or claim arising from or relating to this Agreement or Alexa is subject to binding arbitration, governing law, disclaimer of warranties, limitation of liability, and all other terms in the Amazon.com Conditions of Use. By using Alexa, you agree to be bound by those terms.

(*Id*. at ¶ 11, Ex. 7.) The Alexa Terms provide a hyperlink to the COUs and its arbitration agreement. (*Id*.)

In addition, when a parent enables a feature specifically designed for children under age 13, called a "Kid Skill," Amazon notifies the parent of the information collected from the child user of the Kid Skill (including his or her voice) and then obtains the Parent's express consent through an additional consent process. (*Id*. at ¶ 14, Ex. C ("Parental Consent").) Specifically, the parent must confirm their identity and expressly "consent to Amazon's collection, use, and disclosure of Child Personal Information," by clicking "I agree." (*Id*.) Amazon's Parental Consent disclosure states that it will collect a child's voice in connection with that skill. (*Id., Ex. 3 at "Parental Consent") ("We offer some services intended for children, and in some cases we may know a child is using our services (for example, when using a child profile). In these situations, children may share and we may collect personal information" including voice recordings, but "[w]e will not knowingly collect, use, or disclose this information without [parental] consent.").)

Finally, Amazon users agree to Amazon's COUs containing the arbitration agreement every time they make a purchase through Amazon's standard checkout process. (Buckley Decl. at ¶¶ 3, 24-26.) When customers make purchases on Amazon using the standard checkout page, Amazon displays a notice informing customers that by completing their purchase, they are agreeing to Amazon's COUs. (*Id*. at ¶ 24.)

Importantly, Plaintiffs do not challenge the validity of Amazon's arbitration provision, or deny that this provision would be enforceable against the parents if they had brought this case on

behalf of themselves. It is undisputed that Plaintiffs' parents agreed to Amazon's COUs, Alexa Terms, and arbitration provision when they created their Amazon accounts and registered the Alexa-enabled devices that Plaintiffs used. The parents also agreed to the Amazon COUs multiple times when making purchases through Amazon. (MTC at 11-14; Dkt. 66, Ex. A (Gillespie Decl.) at ¶¶ 7-89.) Plaintiffs also appear to concede that their parents (or other household members) allowed them use the Alexa-enabled devices. (FAC at ¶¶ 45, 51, 63, 69, 81, 87, 99, 105, 111.) Accordingly, the sole question before the Court at this time is whether the Plaintiffs, as nonsignatories who have used their parents' Alexa-enabled devices, are also bound by their parents' valid arbitration agreements with Amazon by principles of equitable estoppel.

   B.   The Federal Arbitration Act and Governing Law

   The Federal Arbitration Act ("FAA") provides that "an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The purpose of the FAA is to "reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24 (1991). To that end, the FAA requires courts to stay proceedings when an issue before the Court can be referred to arbitration. 9 U.S.C. § 3.

   Under the FAA, the Court's role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). If the party seeking arbitration establishes both factors, "then the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms." *Id.* "[A]ny doubts concerning the scope of

arbitrable issues should be resolved in favor of arbitration. . . ." *Id.* at 1131; *see also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985); *Kilgore v. Keybank, N.A.*, 718 F.3d 1052, 1058 (9th Cir. 2013). Since the Supreme Court's decision in *AT&T Mobility LLC v. Concepcion*, 1563 U.S. 333 (2011), it has also been well-settled that class action waivers – and arbitration agreements containing such waivers – are valid and enforceable. *Concepcion*, 563 U.S. at 351; *see also Coneff v. AT&T Corp.*, 673 F.3d 1155, 1158 (9th Cir. 2012) (holding that the FAA preempted a Washington statute invalidating class action waivers and that the arbitration provision at issue was valid and enforceable).

   "[T]he party seeking to enforce an arbitration agreement bears the burden of showing that the agreement exists and that its terms bind the other party." *Peters v. Amazon Servs. LLC*, 2 F. Supp. 3d 1165, 1169 (W.D. Wash. 2013). To determine whether the parties agreed to arbitrate, courts apply ordinary state-law contract principles. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). The parties agree that Washington law governs the arbitration clause at issue. (MTC at 16; Opp'n at 9.)[2] In Washington, "[t]he role of the court is to determine the mutual intentions of the contracting parties according to the reasonable meaning of their words and acts." *Fisher Props., Inc. v. Arden-Mayfair, Inc.*, 106 Wn.2d 826, 837 (1986).

   As noted above, Plaintiffs do not challenge the validity of Amazon's arbitration provision. Absent a specific challenge by Plaintiff, it is unnecessary to discuss Defendants' arguments regarding the validity of Amazon's COU and Alexa Terms in detail. (MTC at 16-17,

---

[2] The Amazon COUs provide that "the laws of the state of Washington, without regard to principles of conflict of laws, will govern these Conditions of Use and any dispute of any sort that might arise between you and Amazon." (Buckley Decl., Ex. 1-6 at "Applicable Law.") Similarly, the Alexa Terms state that "any dispute or claim arising from or relating to this Agreement or Alexa is subject to the . . . governing law . . . and all other terms in the Amazon.com Conditions of Use." (*Id.* at ¶ 7, Ex. 7.)

26-29.)[3] The parties' sole disagreement pertaining to the issue of arbitration relates to the second prong of the *Chiron* test: whether the arbitration agreement encompasses this dispute between Plaintiffs, as nonsignatories to their parents' contracts, and Amazon. *See Chiron*, 207 F.3d at 1130.

C.      Equitable Estoppel

"The United States Supreme Court has held that a litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement." *Kramer v. Toyota Motor Corp*., 705 F.3d 1122, 1128 (9th Cir. 2013) (citing *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (holding state law governs whether an arbitration agreement is enforceable by or against a nonsignatory under the FAA).) "In determining whether parties have agreed to arbitrate a dispute, [courts] apply 'general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration.'" *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044 (9th Cir. 2009) (quoting *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1049 (9th Cir. 1996).) "General contract and agency principles apply in determining the enforcement of an arbitration agreement by or against nonsignatories." *Id.* at 1045 (citing *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006).) These principles include equitable estoppel. *Id.*

---

[3] The Court notes that the arbitration provision at issue has been found valid and enforceable by this Court (and others) on several recent occasions. *See Payne. Amazon.com, Inc.*, Case No. 2:17-cv-2313-PMD, 2018 WL 4489275, *8 (D. S. Carolina July 25, 2018); *Ekin v. Amazon Services, LLC*, 84 F.Supp.3d 1172, 1175 (W.D. Wash. 2014) (finding Amazon's arbitration provision valid and enforceable and compelling arbitration); *Fagerstrom v. Amazon.com, Inc.*, 141 F. Supp.3d 1051, 1057-60, 1064-76 (S.D. Cal. 2015) (same); *Peters v. Amazon Services*, LLC, 2 F. Supp.3d 1165, 1170 (W.D. Wash. 2013) (same).

REPORT AND RECOMMENDATION - 8

The Ninth Circuit has recognized two types of equitable estoppel in the arbitration context. First, the court has recognized that nonsignatory plaintiffs may be able to enforce an arbitration agreement against a signatory defendant. *Id.* at 1046 (citing *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates*, 269 F.3d 187, 199 (3d Cir. 2001).) Under this theory, a signatory may be required to arbitrate a claim brought by a nonsignatory where the subject matter of the dispute is intertwined with the contract providing for arbitration, and the nonsignatory and signatory parties have a "close relationship." Second, a nonsignatory plaintiff may be compelled to arbitrate his or her claims if he or she "knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement." *Mundi*, 555 F.3d at 1046 (quoting *DuPont*, 269 F.3d at 201); *see also Townsend v. Quadrant Corp.*, 173 Wash.2d 451, 461 (2012).

Amazon contends that Plaintiffs are bound by the arbitration agreement under both theories of equitable estoppel. (MTC at 20.) Plaintiffs respond that neither theory applies to their claims in this case. (Opp'n at 5-6.) The Court will discuss each theory of equitable estoppel in turn.

> (1)     First Theory of Equitable Estoppel: Nonsignatory Plaintiffs May Enforce an Arbitration Agreement Against a Signatory Defendant

Amazon argues that Plaintiffs should be required to arbitrate because their statutory claims are intertwined with the Amazon COUs and Alexa Terms that their parents agreed to abide by. (MTC at 23.) Amazon concedes that "this equitable principle has been articulated in the context of nonsignatories seeking to compel a signatory to arbitrate claims against it," but asks the Court to extend this theory to this case because "the principles apply with the same force here." (*Id.*) Amazon asserts that "Alexa cannot be used without an Amazon account holder – here, the Parents or other household members – expressly entering the COUs and Alexa Terms."

1    (*Id.*) Moreover, Amazon argues that the crux of Plaintiffs' claims in this action regarding their

2    voices being recorded without their consent is completely intertwined with the provisions in the

3    Alexa Terms providing that Alexa users' voices are recorded and retained by Amazon. (*Id.* at 24

4    (citing Buckley Decl., Exs. 7-19 ("Alexa streams audio to the cloud when you interact with

5    Alexa. Amazon processes and retains your Alexa interactions, such as your voice inputs. . . .").)

6    Finally, Amazon asserts that Plaintiffs clearly have a close relationship with their parents, the

7    signatories to the arbitration agreements. (*Id.* at 24.)

8         Plaintiffs respond that this "intertwined/close relationship" test applies only where a

9    nonsignatory to an arbitration agreement is attempting to compel arbitration against a signatory,

10   and not the other way around. (Opp'n at 16-18.) Plaintiffs assert that Amazon's attempt to extend

11   this theory of equitable estoppel to compel a nonsignatory to arbitration "[flies] in the face of

12   unbroken and well-reasoned precedent." (*Id.* at 17) (citing *Double D Trade Co., LLC v. Lamex*

13   *Foods, Inc.*, No. C09-0919RSL, 2009 WL 4927899, at *6 (W.D. Wash. Dec. 14, 2009)

14   ("Although a nonsignatory can enforce an arbitration agreement against a signatory because of

15   close relationships between the entities involved and between the alleged wrongs and the

16   contract containing the arbitration agreement, courts have not compelled nonsignatories to

17   arbitrate under this theory.").

18        The Court agrees with Plaintiff that the "intertwined/close relationship" theory of

19   equitable estoppel is inapplicable here. Amazon has cited no authority, and the Court is aware of

20   none, holding that this theory should bind nonsignatories to arbitration agreements they have not

21   consented to. As the Ninth Circuit explained in *Comer*, where a defendant is invoking equitable

22   estoppel against a nonsignatory, only the line of cases holding that nonsignatories may be

23   compelled to arbitrate where they knowingly exploited the agreement containing the arbitration

1   clause is relevant. *See Comer*, 436 F.3d at 1101.  The "intertwined/close relationship" theory of

2   equitable estoppel applies only where "*signatories* have been required to arbitrate claims brought

3   by nonsignatories at the nonsignatories' insistence because of the close relationship between the

4   entities involved." *Id.* (emphasis in original and internal quotation marks omitted).[4]

5          Accordingly, the Court declines Amazon's invitation to extend this theory to Plaintiffs'

6   claims, simply by virtue of Plaintiffs' close relationship with their parents. This position has no

7   basis in "ordinary contract and agency principles." *Id*.

8          (2)     Second Theory of Equitable Estoppel: Nonsignatory Plaintiffs Who "Knowingly
                   Exploited" the Agreement May Be Compelled to Arbitrate

9

10                 (a)      *Parties' Contentions*

11         Amazon contends that Plaintiffs were able to enjoy the benefits of Alexa because their

12   parents, through whom they bring this suit, bought and installed Alexa devices, agreed to the

13   Amazon COUs and Alexa terms, enabled Alexa on those conditions in their households, and then

14   permitted the children to use the devices. (MTC at 21.) Amazon asserts that it would eviscerate

15   the core function of arbitration agreements (and offend basic notions of fairness) to permit those

16   same parents to avoid those conditions by bringing suits through their children. (*Id*.) Amazon

17   contends that as nonsignatories, Plaintiffs should be compelled to arbitrate their claims because

18   they "knowingly exploited" the agreement at issue. (*Id*.)

19

20   _____

     [4] *See also InfoSpan, Inc. v. Emirates NBD Bank PJSC*, No. SACV111062JVSANX, 2012 WL 12960766,
     at *4 (C.D. Cal. Dec. 7, 2012) ("Because the Bank is invoking equitable estoppel against a nonsignatory,
21   only the ["knowingly exploits" line of cases] is relevant."); *Brown v. Comcast Corp.*, No.
     EDCV1600264ABSPX, 2016 WL 9109112, at *6 (C.D. Cal. Aug. 12, 2016) ("Because this case involves
22   a signatory Defendant attempting to bind a nonsignatory Plaintiff, the Court focuses on the ["knowingly
     exploits"] type."); *Janvey v. Alguire*, 847 F.3d 231, 242 (5th Cir. 2017) (holding that "intertwined claims"
23   theory "governs motions to compel arbitration when a signatory-plaintiff brings an action against a
     nonsignatory-defendant asserting claims dependent on a contract that includes an arbitration agreement"
     and does not apply "where a signatory-defendant seeks to  compel arbitration with a nonsignatory-
     plaintiff").

1    During oral argument, Amazon explained that Plaintiffs should be found to have

2    "knowingly exploited" the contact because they received the benefit of Amazon's performance

3    of the contract, *i.e.*, the ability to ask Alexa for a weather report, homework help, or to play

4    music. (Dkt. # 76 (10/17/2019 hearing on the MTC).) Amazon contends that federal and state

5    caselaw has held that a nonsignatory "knowingly exploited" the contract if one of two elements

6    are satisfied: (1) the nonsignatory knowingly received the benefits of the contract (the "direct

7    benefits" theory), *or* (2) the nonsignatory brought a claim under the contract, such as suing to

8    enforce express or implied warranties. Amazon contends that a nonsignatory can "knowingly

9    exploit" a contract in either of these two ways, receiving a direct benefit or asserting a contract

10   claim, and therefore the fact that Plaintiffs are asserting only statutory claims is not

11   determinative. (*Id.*) Amazon argues that Plaintiffs knowingly received the direct benefit of their

12   parents' bargain with Amazon, and should be compelled to arbitrate their claims as a result. (*Id.*)

13       Plaintiffs respond that although it is true that a nonsignatory can be compelled to arbitrate

14   claims if she "knowingly exploits" the contract containing the arbitration requirement, because

15   "knowingly exploiting" a contract can essentially constitute consent to the agreement, "courts

16   uniformly and sensibly hold that a non-signatory 'knowingly exploits' a contract where she

17   brings claims under the contract." (Opp'n at 5.) A nonsignatory, however, does not consent to a

18   contract where she brings only tort or statutory claims, like Plaintiffs' statutory claims in this

19   putative class action, and Washington courts have repeatedly rejected arguments that such claims

20   can be compelled into arbitration on an equitable estoppel theory. (*Id.* at 9.) Plaintiffs contend

21   that "Washington courts have held that a non-signatory 'knowingly exploits' a contract only

22   where he or she brings contract-based claims that arise under the contract containing the

23   arbitration agreement." (*Id.*) During oral argument, Plaintiffs pointed out that Amazon has failed

1   to identify any case, apart from two factually distinguishable "account sharing" cases, where

2   equitable estoppel was applied to a nonsignatory plaintiff who had not also brought a contact

3   claim. (10/17/2019 hearing on MTC.)[5] Thus, Plaintiffs contend that Amazon's assertion that a

4   nonsignatory plaintiff "knowingly exploits" a contract either by receiving a direct benefit or

5   asserting a contract claim is not supported by caselaw.

6                    *(b)*        Townsend v. Quadrant Corp.

7           The most significant case on point is the Washington Supreme Court's ruling in

8   *Townsend*, 173 Wash. 2d 451. In *Townsend*, plaintiff home purchasers and their children brought

9   claims for unfair business practices, negligence, negligent misrepresentation, and breach of

10  warranty (among others) against a defendant homebuilder and its parent companies. *Id.* at 454.

11  The homeowners alleged that the builder's poor workmanship resulted in serious construction

12  defects that in turn caused personal injuries from mold, pests, and poisonous gases. *Id.* The

13  builder moved to compel arbitration of the claims, citing a clause in the purchase agreements

14  signed by each homeowner. *Id.* The Washington Supreme Court examined whether the

15  homeowners' children, who were nonsignatories of the purchase agreements, were bound by the

16  agreements' arbitration clauses to the same extent as their parent-signatories. *Id*. at 460-61. The

17  court determined that the children were equitably estopped from avoiding arbitration because

18  their claims fell within the limited category of cases in which a nonsignatory seeks to knowingly

19  exploit a contract by claiming the benefits within it, while avoiding the burdens it imposes. *Id.* at

20  462 (citing *Mundi*, 555 F.3d at 1045–46).

21

22

23  [5] The Court will explain in greater detail below why these two "account sharing" cases, *Nicosia v. Amazon.com, Inc*., 384 F. Supp. 3d 254 (E.D.N.Y. 2019) and *Bridge v. Credit One Financial*, Case NO. 2:14-cv-1512, 2016 WL 1298712, *3 (D. Nev. Mar. 31, 2016), are distinguishable from this action.

REPORT AND RECOMMENDATION - 13

1    Importantly, the court rejected the plaintiffs' arguments that the children were not

2    attempting to enforce the purchase agreements and had not based their claims on any warranty in

3    them. *Id.* at 461. The court explained:

4    > Throughout the pleadings . . . the parents and children are referred to collectively as
     > the "plaintiffs" and they present eight identical causes of action. Additionally, two

5    > of the causes of action alleged by the parents and their children relate directly to the
     > [purchase agreements], including an allegation of breach of warranty and a request

6    > for rescission. It is apparent, contrary to the contention made by the [parents], that
     > the children are attempting to enforce the terms of the [purchase agreements] and

7    > that they base their claim for breach of warranty on the warranties contained therein.

8    *Id.*

9    The court concluded that since the children were attempting to obtain the benefits of the

10   contract without the burden of compelled arbitration, they were attempting to exploit the

11   purchase agreements. *Id.* at 462. Thus, the court held that under *Mundi*, 555 F.3d 1042, the

12   children were bound by the arbitration clauses to the same degree as their parents, through

13   equitable estoppel. *Id.*

14              (c)    *State and Federal Courts Apply the* Townsend *Rule Where Plaintiff's*
                       *Claims Relate Directly to, or Arise From, the Contract*

15   Several more recent cases have applied *Townsend*, and concluded that nonsignatory

16   plaintiffs must be compelled to arbitrate their claims against the defendant only where the

17   plaintiffs brought claims relating directly to, or arising from, the contract. In *Madera W. Condo*

18   *Ass'n v. Marx/Okubo*, 175 Wash. App. 1032 (2013), the court explained that *Townsend* applied

19   equitable estoppel because "the parents and children's claims 'related directly' to the purchase

20   and sale agreement, 'including an allegation of breach of warranty and request for rescission.'"

21   *Id.* at *16 (quoting *Townsend*, 173 Wash. 2d at 461). The court held that the *Townsend* rule did

22   not apply because the plaintiff "did not assert breach of contract claims against Marx/Okubo; it

23   asserted negligent misrepresentation and professional negligence claims." *Id*. The plaintiff was

1   not "knowingly exploiting" the contract because "it was not basing its tort claims on the

2   contract." *Id.* The court further noted that because plaintiff brought "tort claims [that] were based

3   on common law and statutes[,] . . . the doctrine of equitable estoppel does not support

4   Marx/Okubo's argument." *Id.; see also SVN Cornerstone LLC v. N. 807 Inc*., 199 Wash. App.

5   1010, (2017) (distinguishing *Townsend* because, in that case, "the children were attempting to

6   enforce the terms of [the] agreement, including its warranties" while the defendant in *SVN*

7   *Cornerstone* were "not trying to enforce rights under Mr. Seipp's independent contractor

8   agreement"); *Powell v. Sphere Drake Ins. P.L.C*., 97 Wash. App. 890, 894 (1999) (declining to

9   compel arbitration against nonsignatory where "[a] plain reading of Powell's amended complaint

10   shows that his claims are based on alleged violations of the state Consumer Protection Act and

11   the fraudulent conveyance act – not the policy of insurance itself" because "they are statutory

12   claims that are separate from the insurance contract itself.").

13         Ninth Circuit precedent also makes clear that a party does not knowingly exploit a

14   contract by only bringing statutory or tort claims. In *Comer*, for example, a participant in an

15   ERISA plan brought statutory claims against an investment advisor, and the investment advisor

16   attempted to compel arbitration based on the agreement between the advisor and the plan

17   trustees. 436 F.3d at 1102. The Ninth Circuit held that the plan participant was not required to

18   arbitrate his claim because "he did not seek to enforce the terms of the management agreements,

19   nor otherwise to take advantage of them." *Id*. Rather, his lawsuit was based entirely on ERISA

20   and not the investment management agreements. *Id*. The court held that the defendants' attempt

21   to "shoehorn Comer's status as a passive participate in the plans into his [knowing exploitation]

22   of the investment management agreements fails." *Id.; see also Mundi*, 555 F.3d at 1047

23   (declining to compel Mundi to arbitrate her claim that USLIC breached the insurance policy

1    because that claim is not connected with "the contract providing for arbitration – the EquityLine

2    agreement," nor does her claim "arise out of" or "relate directly to" the EquityLine agreement,

3    resolution of the claim does not require the examination of any provisions of the EquityLine

4    agreement, and Mundi's claim is based solely on USLIC's actions.) The Washington Supreme

5    Court in *Townsend* adopted the analysis of the Ninth Circuit in *Comer* and *Mundi*, and the

6    Honorable Richard A. Jones noted in *E.W. Bank v. Bingham* that "the Court believes that

7    Washington courts would apply the same standard recited in *Mundi*." 992 F. Supp. 2d 1130,

8    1133 (W.D. Wash. 2014).

9          Numerous cases interpreting and applying Washington law have expressly acknowledged

10   the proposition that equitable estoppel does not apply where the plaintiffs are suing on statutory

11   grounds, rather than bringing claims under the contract. *See Loyola v. Am. Credit Acceptance*

12   *LLC*, No. 2:19-CV-00002-SMJ, 2019 WL 1601362, at *7 (E.D. Wash. Apr. 15, 2019) (refusing

13   to apply equitable estoppel because the plaintiffs "do not allege Defendants breached the contract

14   and instead claim they violated the FDCPA, UCC, and CPA" and while these claims "certainly

15   relate to the contract, they do not arise from it directly"); *McKee v. Audible, Inc.,* No. CV 17-

16   1941-GW(EX), 2017 WL 4685039, at *14 (C.D. Cal. July 17, 2017) ("Here, Plaintiff has not

17   claimed the benefits of his agreement to arbitrate his claims against Amazon. He has sued

18   Audible and Amazon on statutory grounds . . . . As a result, Audible cannot invoke principles of

19   equity to force Plaintiff to arbitrate his claims against it regardless of its relationship with

20   Amazon."); *Stuart v. Korey*, No. C16-181-RSM, 2017 WL 1496360, at *4 (W.D. Wash. Apr. 26,

21   2017) (plaintiff not subject to equitable estoppel because he was "not attempting to enforce the

22   Agreement while avoiding the mandatory arbitration clause"); *Joseph v. TrueBlue, Inc.*, No.

23   C14-5963-BHS, 2015 WL 575289, at *3 (W.D. Wash. Feb. 11, 2015) (holding that the defendant

REPORT AND RECOMMENDATION - 16

1   was "not entitled to enforce arbitration by equitable estoppel" because the plaintiff was

2   "asserting TCPA claims that do not arise out of or relate to either contract" and instead brought

3   "statutory claims that are separate from the [ ] contract itself"); *Double D Trade Co., LLC v.*

4   *Lamex Foods, Inc.*, No. C09-0919RSL, 2009 WL 4927899, at *6 (W.D. Wash. Dec. 14, 2009)

5   (declining to apply equitable estoppel because the plaintiff's "claim is based entirely on his

6   personal guaranty [and] there is no evidence on the record that [plaintiff] has sought to enforce

7   the terms of the agreements or to take advantage of them"); *Univera, Inc. v. Terhune*, No. C09-

8   5227 RBL, 2009 WL 3877558, at *2 (W.D. Wash. Nov. 18, 2009) (refusing to apply equitable

9   estoppel to require arbitration of claims "based on common law tort principles, including tortious

10  interference, unfair competition, and defamation" because "[n]one of these causes of action

11  shows that Mr. Terhune or Mr. Douglas 'knowingly exploited the Associate Agreement that their

12  respective LLCs had with Univera").

13          Even the recent district court case cited heavily by Amazon, *Payne v. Amazon, Inc.*, held

14  that the nonsignatory plaintiff was bound by her signatory fiance's agreement with Amazon

15  because, among other reasons, her breach of implied warranty claim against Amazon was

16  contractual in nature. Case No. 2:17-cv-2313-PMD, 2018 WL 4489275, *6-7 (D.S.C. July 25,

17  2018). The court found "no meaningful difference between *Townsend* and the present case," as

18  the plaintiff's "breach of warranty claim . . . rests on the contract between [her signatory fiancé]

19  and Amazon, which included an arbitration agreement." *Id*. at *7. Thus, the court concluded that

20  the plaintiff had "knowingly exploited" her fiance's contractual agreement with Amazon. *Id*.

21          (d)     *The* Townsend *Rule Does Not Apply Because Plaintiffs' Statutory Claims Do Not
                    Relate Directly To, Or Arise From, Their Parents' Agreements*

22          As discussed above, *Townsend* and its progeny hold that a nonsignatory plaintiff may be

23  compelled to arbitration where he or she "knowingly exploit" the contract. In this case,

Plaintiffs are asserting claims only under the statutory law of their respective states protecting their right to privacy in their confidential communications. (FAC at ¶¶ 129-232.) As Plaintiffs' claims do not arise from, or relate to, any contractual rights between Amazon and their parents, Amazon cannot compel arbitration based on a theory that Plaintiffs have "knowingly exploited" a contract they have never relied upon.

Amazon seizes upon vague language in the cases cited above to argue that Plaintiffs' use of an Alexa-enabled device amounts to "knowing exploitation" of the agreement, regardless of the nature of the claims they allege in this action, because Plaintiffs received the direct benefit of their parents' contracts. Amazon asserts that "the legal standard provides that either suing on a contract *or* otherwise exploiting that contract is sufficient to invoke equitable estoppel." (Dkt. # 72 ("Amazon's Reply") at 7.) Amazon asserts, for example, that the Ninth Circuit declined to compel the passive investment plan participant in *Comer* to arbitrate his claims because unlike Plaintiffs, "who affirmatively asked Alexa to help with their homework, or to find music they liked – the passive plan participant in *Comer* never asked the investment manager to do anything." (*Id.* at 8.) During oral argument Amazon quoted *Comer*'s holding that the nonsignatory had not knowingly exploited the agreements containing the arbitration clauses:

> Prior to his suit, Comer was simply a participant in trusts managed by others for his benefit. He did not seek to enforce the terms of the management agreements, nor otherwise to take advantage of them. Nor did he do so by bringing this lawsuit, which he bases entirely on ERISA, and not on the investment management agreements.

436 F.3d at 1102. Amazon argues this language shows the Ninth Circuit's primary concern was whether Comer had received a direct benefit of the agreements, rather than whether he was asserting any claims under them. Similarly, Amazon argues the courts in *Payne* and *Nicosia* compelled arbitration because the plaintiffs in those cases had knowingly received the benefit of

1   the contractual relationship. (Amazon's Reply at 10 (citing *Payne*, 2018 WL 4489275, at *5 and

2   *Nicosia*, 384 F. Supp. 3d at 274-75).)

3          However, Amazon's proposed "either/or" test for knowing exploitation of the contract is

4   simply not supported by caselaw. It ignores all the cases, cited above, which clearly rely upon

5   the question of whether a nonsignatory plaintiff was asserting contract claims against the

6   defendant as the critical part of their equitable estoppel analysis. *See Double D Trade Co.,* 2009

7   WL 4927899, at *6 (declining to apply equitable estoppel because the nonsignatory plaintiff's

8   "claim is based entirely on his personal guaranty [and] there is no evidence on the record that

9   [plaintiff] has sought to enforce the terms of the agreements or to take advantage of them"

10  although as owner of the company he likely directly benefited from the agreement); *Univera,*

11  *Inc.*, 2009 WL 3877558, at *2 (declining to apply equitable estoppel to require arbitration of

12  claims of owners of LLCs "based on common law tort principles, including tortious

13  interference, unfair competition, and defamation" because "[n]one of these causes of action

14  shows that Mr. Terhune or Mr. Douglas 'knowingly exploited' the Associate Agreement that

15  their respective LLCs had with Univera"). Amazon also fails to identify any case (apart from

16  two easily distinguishable account sharing cases, discussed below) where courts have found

17  "knowing exploitation" of a contract in the absence of such contract claims.

18         The Court concludes that neither principles of equitable estoppel nor "ordinary contract

19  and agency principles" supports the logic and policy advanced by Amazon in this case, *i.e.*, that

20  any individual can be bound to arbitrate simply because he or she directly benefited in some

21  way from using the product or service obtained by another via the contract. As federal courts

22  have noted, compelling any non-primary user of a particular service to arbitration under the

23  theory of equitable estoppel would lead to absurd results, as even a casual visitor to a residence

could be bound by an agreement without notice because any use of those services could constitute receipt of a direct benefit. *See e.g.*, *Brown v. Comcast Corp*., Case No. 16-cv-00264ABSPX, 2016 WL 9109112, at *8 (C.D. Cal. Aug. 12, 2016) (declining to bind plaintiff to arbitration under a theory of equitable estoppel because "by this same logic, every time a person uses services such as cable or Internet at another person's residence, no matter how long the use was, he or she would be bound to the underlying service agreement in perpetuity because the use of services would be considered a direct benefit"). That is neither the law of Washington, nor the law of this Circuit.

Amazon's related argument  that "the crux of Plaintiffs' claims – *i.e*., their voices were recorded allegedly without consent – directly arise out of and are inseparable from the contract" is also unpersuasive. (Amazon's Reply at 11.) Amazon points out that the Alexa Terms provide that Alexa users' voices are recorded and retained by Amazon, and Amazon asserts that the parents have agreed they are responsible for access to their accounts and oversight of minors' use. (*Id*.) Amazon contends that Plaintiffs cannot disclaim the fact that their parents' contract was indispensable to their access to Alexa in the first place. (*Id*.)

Without more, however, the fact that Plaintiffs' claims relate in some fashion to their parents' contracts with Amazon (in that their parents were required to enter into contractual agreements with Amazon to obtain and operate the Alexa-enabled devices) is not sufficient to bind Plaintiffs to arbitration under *Townsend* and its progeny. Amazon has not cited any case (and the Court is aware of none) holding that a close relationship between the signatory and nonsignatory, without the nonsignatory also asserting claims under the contract, is sufficient to bind the nonsignatory to an arbitration provision contained therein. *See Comer*, 436 F.3d at 1102; *Townsend*, 173 Wash. 2d at 461-162; *Payne*, 2018 WL 4489275, at *7.

REPORT AND RECOMMENDATION - 20

1    Amazon's policy arguments, however appealing at first blush, are not simply not

2    supported by caselaw. Accordingly, Amazon's contention that Plaintiffs should be estopped

3    under the second theory of equitable estoppel also fails. *See Mundi*, 555 F.3d at 1046.

4         D.    Amazon's "Account Sharing" Theory of Equitable Estoppel

5         Finally, Amazon analogizes this case to a recent decision from the Eastern

6    District of New York, *Nicosia*, and argues that this Court should adopt that court's reasoning

7    (although none of the Plaintiffs in this case are alleging violations of New York statute).

8    (Amazon's Reply at 12 (citing *Nicosia*, 384 F. Supp. 3d at 273).) In *Nicosia*, the plaintiff used

9    his wife's "Amazon Mom" account to purchase weight-loss supplements and later brought a

10   putative class action against Amazon, asserting that the supplements violated federal and state

11   safety laws. *Nicosia*, 384 F. Supp. 3d at 257-58. To enroll in an "Amazon Mom" account, a user

12   must accept the Amazon Prime Terms and Conditions which incorporate an arbitration

13   provision. *Id*. at 258. The court held that the plaintiff must arbitrate under the Amazon Mom

14   account agreement, because "the indelible feature of estoppel . . . is that one party has made a

15   representation, upon which another party justifiably relies to their detriment[.]" *Id*. at 273. The

16   plaintiff had used his wife's credentials to log into and use his wife's account, thereby "implicitly

17   represent[ing] that he was the true accountholder." *Id*. at 275. The court in *Nicosia* held that

18   because plaintiff's misrepresentation allowed him to "enjoy the same contractual rights she

19   enjoyed, viz., the right to place an order on Amazon.com," plaintiff must also be held to the

20   arbitration clause that governs that relationship "under either a traditional theory of equitable

21   estoppel or direct benefits estoppel." *Id*. The court also noted that while the "directs benefits test

22   closely approaches the paradigm for traditional equitable estoppel . . . it is not a perfect overlap."

23   *Id*. at 274 (internal quotations omitted).

REPORT AND RECOMMENDATION - 21

The facts of *Bridge v. Credit One Financial* are similar. *See* Case No. 2:14-cv-1512, 2016 WL 1298712, *3 (D. Nev. Mar. 31, 2016). In *Bridge*, the court applied equitable estoppel to compel an arbitration provision in a Telephone Consumer Protection Act claim where the plaintiff had "benefited from [his mother's] agreement by Calling Credit One, inputting his mother's validation information, and gaining access to his mother's financial information." *Id.* To gain access to his mother's confidential banking information, the plaintiff had, in effect, represented to Capital One that he was his mother, just as the plaintiff in *Nicosia* made a purchase on Amazon.com as if he was his wife.

The Court finds the facts of *Nicosia* and *Bridge* easily distinguishable from this case. Unlike the Nicosia's use of his wife's password-protected Amazon.com account, or Bridge's use of his mother's confidential information to gain access to her financial information, Alexa can be used by anyone within a reasonable proximity of an Alexa-enabled device – regardless of that person's identity as an accountholder, adult, child, houseguest, or stranger off the street. Unlike the plaintiffs in *Nicosia* and *Bridge*, Plaintiffs did not need to "implicitly represent" that they were another person to gain access to the Alexa-enabled devices. *See Nicosia*, 384 F.Supp.3d at 259; *Bridge*, 2016 WL 1298712, at *3. They were not asked to verify their identity, provide a password, or take any other steps to impersonate a registered accountholder to use the Alexa-enabled devices.

Amazon argues that failure to adopt this "account sharing" theory of equitable estoppel "will amount to a categorical rule that a parent's agreement to arbitrate disputes can never bind minors within the household – no matter how extensive an individual plaintiff's use, or how pervasive and intentional the 'account sharing.'" (Amazon's Reply at 13.) Of course, this is not true. Amazon has not cited any authority holding that the parents could not, on behalf of their

children, have expressly agreed by contract to submit their children's claims to arbitration. Such a provision was simply not part of Amazon's COUs and Alexa Terms. Accordingly, the Court does not find the reasoning of *Nicosia* and *Bridge* persuasive, or applicable to this matter.

### III.    CONCLUSION

Accordingly, for the reasons stated above, the Court recommends that Amazon's Motion to Compel Arbitration (dkt. #55) be DENIED. The Clerk is directed to send copies of this order to the parties and to the Honorable Richard A. Jones.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit by no later than **November 4, 2019**. Objections, and any response, shall not exceed twelve pages. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motion calendar **fourteen (14)** days after they are served and filed. Responses to objections, if any, shall be filed no later than **fourteen (14)** days after service and filing of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on the date that objections were due.

Dated this 21st day of October, 2019.

MICHELLE L. PETERSON
United States Magistrate Judge